# EXHIBIT D

I, John Steele, under the penalty of perjury, declare and state:

1. I am over eighteen years of age and am competent to testify as to the matters set forth herein. I make this affidavit on the basis of my personal knowledge and, if called, would be prepared to testify as follows.

2. I owned a 120 acre property with two cabins located at 21067 220th St, McGrath Minnesota 56350 from 2005 until early 2013. I was introduced to Mr. Alan Cooper by a mutual friend named Brent Berry in 2006. A short time before I met Alan, my cabin had been broken into and I was looking for someone to keep an eye on the place. In exchange for living rent-free at my cabin with his young daughter, Alan agreed to look after the property and perform basic upkeep services. It is my understanding that, at this time, Alan had been employed for years at a nearby fabrication plant.

3. I spent a great deal of time at my cabin between 2003 and 2011. Alan shared many common outdoor related interests and I began to develop a friendship with him.

4. During the first few years I knew Alan, I would make up to 2 trips a month to my cabin. Alan was usually there, and we would normally spend the weekend hiking, snowmobiling, four wheeling, working on projects around the cabin, boating on nearby Mille Lacs Lake, and attending auctions in the area. We regularly attended local county festivals, including the White Pine Logging and Thrashing show, Howie's Mud Bog, the Aitkin County July 4th fair, Kanabec County Fair, and many others events. I estimate that Alan joined my family for dinner well over 100 times. On several occasions he babysat my daughter. Alan remarked on several occasions that I was the brother he never had. I considered Alan to be a very close friend.

5. Over the years, Alan I discussed our various personal issues from divorces, to financial matters. I understand that Alan was laid off sometime in 2010. He discussed his financial hardship with me. I would help him out with paying bills from time to time and would always pay for food and pick up the bar tab whenever we went out together.

6. According to Alan, his wife and many other people had taken advantage of him in the past. He told me, and others, many times that he would never forget all the help I had given him over the years. He oftentimes referred to me as "the brother he never had", and regularly would tell people we were actual brothers. He regularly inquired whether there was a way he could get into business with me.

7. Around this time, I was a partner in a law firm organized to fight digital piracy. I discussed my business with Cooper and gave him the basics of the process for tracking down individuals who steal copyrighted content online and initiating legal action against them.

8.  During this conversation, I described how other people in the adult industry utilized my law firm's services, including smaller clients. Alan was very interested and asked me some questions about how to start such a business. I recall he liked the idea of working from home, and I specifically recall him joking that he was going to make "Redneck Porn" and that he could be one of the male stars in his own works. I agreed to help him set up a company for him and help him out in getting started with his business.

9.  Shortly thereafter Alan told me that he could not put any time into the project and I believe that he never ended up following through with getting his new company off the ground. As a less time intensive alternative, I suggested that if Alan wanted to learn more about the adult industry, I could connect him to a new company that was run by Mark Lutz.

10. I informed Alan that one way to get his name established would to serve in a corporate representative role, which would let him gain exposure to the types of deals Mr. Lutz was doing and see if that was something that appealed to him.

11. My understanding is that Alan took me up on the offer and participated in a limited number of transactions in 2011 with Mr. Lutz's companies. I am not aware of any post-2011 transaction in which Alan participated.

12. I began to notice serious changes in Alan's behavior beginning in early 2012.

13. Alan was experiencing more financial hardship, was going through a second divorce and was exhibiting signs of excessive alcohol use. As Alan's financial situation worsened, his talk of various money making ideas grew, and his hints at needing financial help from me became more frequent.

14. Before 2012, Alan was very outgoing, happy, and positive person. When I saw Alan in early 2012, he exploded for no reason and started ranting about money and threatening me. The next morning, I approached him and said that his behavior was out of line. He immediately broke down and started crying, explaining that he had not taken his anti-psychotic medication the previous day. This was the first time I was aware that he had been diagnosed with a mental health problem and was prescribed medication for it.

15. I made it clear to him that myself and others were uncomfortable with his behavior the previous night and that he needed to respect my friends and family. He made it clear to me that he felt very sorry for his behavior and that he would remain on his medication. During this conversation, Alan also described his worsening financial condition and how he sometimes has "bad days" like the previous day.

16. Unfortunately, Alan's behavior got worse, and he began threatening people that would come onto my property, including my realtor, my friends, and others I would send to repair the cabin. My trips to my cabin became less enjoyable due to Alan's

constant harassment regarding money. He was now approaching me with dubious business ideas, including a landscaping business, a hauling business and a lumber business. I finally had to ask him to stop asking me for money.

17. In the summer of 2012, I decided to sell my cabin. Alan reacted very negatively to this news.

18. Due to Alan's extreme misconduct with respect to my real estate agent, Brent Berry, I finally had to ask him to leave my property in September 2012.

19. Alan was very upset that I asked him to leave. After Alan moved out, I learned from neighbors--and then saw for myself--that Alan had used a chainsaw to remove large portions of my guest cabin's load bearing wall, all the interior walls. Alan removed and refused to return 4 rifles, 1 shotgun, and 5 pistols from a shared safe we had. Alan threatened potential buyers of my property, stolen hundreds of items from my kitchen and stolen rooms full of furniture from my cabin. I had not given Alan permission to do any of these acts. The acts listed in this paragraph are the subject of separate litigation between Alan and myself.

20. Alan also stole my large 4-snowmobile trailer, which he used to haul away the other items he stole from me.

21. On September 4, 2012, Alan called me and during a 6-minute tirade, informed me that I had better give him a lot of money or I would be sorry for kicking him out of my property. He blamed me for the fact that he and his daughter had to live in various friends' homes because he could not afford a place to rent.

John Steele


Dated this 28th day May, 2013


STATE OF FLORIDA)

COUNTY OF MIAMI DADE)
      Subscribed and sworn to me by _John Lawrence Esten_ on this _28th_ day of _May_,
2013.
      Witness my hand and official seal
My commission expires: _1-17-15_

Notary Public

IRMA CALDERON
MY COMMISSION # EE55977
EXPIRES: January 17, 2015
Fl. Notary Discount Assoc. Co.

# EXHIBIT E

### Affidavit of Raymond Rogers

RAYMOND ROGERS, under penalty of perjury, says as follows:

1. I am over eighteen years of age and am competent to testify as to the matters set forth herein. I make this affidavit on the basis of my personal knowledge and, if called, would be prepared to testify at trial as follows.

2. I am the principal of various related entities, including Heartbreaker Films, Heartbreaker Productions, Inc., XSC Digital Corp and Heartbreaker Digital LLC.

3. On June 12, 2011, I executed a Copyright Assignment Agreement, a true and correct copy of which is attached hereto as Exhibit A.

4. On December 20, 2011, I executed a Copyright Assignment Agreement, a true and correct copy of which is attached to as Exhibit B.

5. It is my understanding that all of the rights associated with the works titled "Sexual Obsession" (PA 1-725-120) and "Popular Demand" (PA 1-754-383) have been transferred to AF Holdings LLC.

6. I will be pleased to execute any and all documents to confirm that all of the rights referenced in this document have been fully and effectively transferred.

I declare under the penalty of perjury and upon personal knowledge that the foregoing is true and correct.

Ray Rogers
Dated: December 5, 2012
Las Vegas, Nevada

STATE OF NEVADA
COUNTY OF ___Clark___
This instrument was acknowledged before me on ___January 8, 2013___ (date) by
___Raymond Rogers.___ (name(s) of person(s)).
Notary Public Printed Name: ___Chelsee Jensen___
My Commission Expires: ___July 30, 2016___

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
CHELSEE JENSEN
No. 04-8196-1
My Appointment Expires July 30, 2016

*1*