# EXHIBIT H

# Excerpts of Deposition Transcript of Paul Hansmeier as 30(b)(6) Deponent for AF Holdings, LLC

```
 1

 2                  UNITED STATES DISTRICT COURT

 3          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 4

 5                           --oOo--

 6   AF HOLDINGS, LLC,                    )
                                          )
 7                    Plaintiff,          )
                                          )CASE NO
 8          vs.                           )3:12-CV-02396-EMC
                                          )
 9   JOE NAVASCA,                         )
                                          )
10                    Defendant.          )
     _____)
11

12

13

14   DEPOSITION OF:    PAUL HANSMEIER
     TAKEN BY      :   NICHOLAS RANALLO, ESQ.
15                     MORGAN PIETZ, ESQ.
     COMMENCING    :   10:00 - 6:15 P.M.
16   LOCATION      :   PREMIER BUSINESS CENTER
                       225 BUSH STREET, 16TH FLOOR
17                     SAN FRANCISCO, CALIFORNIA 94104
     DAY, DATE     :   TUESDAY, FEBRUARY, 19TH, 2013
18   REPORTED BY   :   ANGIE M. MATERAZZI, CSR NO. 13116
     PURSUANT TO   :   NOTICE OF DEPOSITION
19   ORIGINAL TO   :   BRETT L. GIBBS, ESQ.

20

21   PAGES 1 - 290

22   JOB NO. 131194

23

24

25
```

```
 1                    APPEARANCES OF COUNSEL

 2

 3

 4    FOR THE PLAINTIFF:

 5
              BRETT L. GIBBS, ESQ.
 6            PRENDA LAW, INC.
              38 MILLER AVENUE, #263
 7            MILL VALLEY, CALIFORNIA 94941
              415-325-5990
 8            BLGIBBS@WEFIGHTPIRACY.COM

 9


10    FOR THE DEFENDANT:

11            NICHOLAS RANALLO, ESQ.
              LAW OFFICE OF NICHOLAS RANALLO
12            371 DOGWOOD WAY
              BOULDER CREEK, CALIFORNIA 95006
13            831-703-4011
              NICK@RANALLOLAWOFFICE.COM
14

15

16    FOR THE DEFENDANT:

17
              MORGAN E. PIETZ, ESQ., CO-COUNSEL
18            THE PIETZ LAW FIRM
              3779 HIGHLAND AVENUE, SUITE 206
19            MANHATTAN BEACH, CALIFORNIA 90266
              310-424-5557
20            MPIETZ@PIETZLAWFIRM.COM

21

22

23                       ---oOo---

24

25
```

```
 1
 2                          I N D E X
 3                     INDEX OF EXAMINATIONS
 4
 5   Examination by Mr. Ranallo ........................6
 6   Examination by Mr. Pietz .........................25
 7   Further Examination by Mr. Ranallo ...............36
 8   Examination by Mr. Pietz .........................37
 9   Further Examination by Mr. Ranallo ...............41
10   Further Examination by Mr. Pietz .................41
11   Further Examination by Mr. Ranallo ...............46
12   Further Examination by Mr. Pietz .................52
13   Further Examination by Mr. Pietz .................54
14   Further Examination by Mr. Ranallo ...............66
15   Further Examination by Mr. Pietz .................68
16   Further Examination by Mr. Ranallo ...............79
17   Further Examination by Mr. Pietz .................80
18   Further Examination by Mr. Ranallo ...............85
19   Further Examination by Mr. Pietz .................88
20   Further Examination by Mr. Ranallo ..............104
21   Further Examination by Mr. Pietz ................106
22   Further Examination by Mr. Ranallo ..............137
23   Further Examination by Mr. Pietz ................139
24   Further Examination by Mr. Ranallo ..............147
25   Further Examination by Mr. Pietz ................148
```

1  into a bunch of a colloquy on the record.  We can talk
2  about it afterwards.  What I'd like right now is for the
3  deponent to simply answer the question.
4              THE WITNESS:  Well, to the noticed topic of
5  would Mr. Gibbs be someone who would receive
6  revenue if a settlement was reached in this case, I
7  believe the answer is yes.
8  BY MR. PIETZ:
9       Q.   And what percentage of the revenue would
10 Mr. Gibbs keep?
11      A.   I can't answer that question specifically.
12      Q.   I am going to note -- I'm going to object to
13 the last answer as nonresponsive.  ** Madam court
14 reporter, would you also be so kind to note this part of
15 the transcript so that we can refer to it later
16           MR. GIBBS:  What do we have in terms of what's
17 left.
18           MR. PIETZ:  It's going to be a full-day
19 deposition.  It's 12:45 now.  I say we break for lunch.
20 Should we come back at 1:45 o'clock?
21           (Off the record at 12:48 p.m. and back
22             on the record at 1:52 p.m.)
23 BY MR. PIETZ:
24      Q.   Back on the record in the 30(b)(6) deposition
25 of AF Holdings.  Mr. Hansmeier, I will refer you to the

1  deposition notice that accompanied the subpoena bringing
2  you here today.  I believe it's marked as Exhibit 100.
3  Attached thereto as Exhibit A is a copyright assignment
4  agreement.  Could you turn to the second page of the
5  copyright assignment agreement.  There on the bottom
6  right, can you read me what it says there on the
7  signature line, please?
8       A.   It says Alan Cooper on behalf of assignee, AF
9  Holdings, LLC.
10      Q.   Who is Alan Cooper?
11      A.   Alan Cooper is an individual who was
12 designated as a corporate representative of AF Holdings,
13 LLC.  The circumstances that led to Mr. Cooper's
14 designation as a corporate representative to acknowledge
15 the copyright assignment agreement on behalf of AF
16 Holdings, LLC, is that Mark Lutz -- we're backing up a
17 little bit.  AF Holdings makes use of corporate
18 representatives, the reason for that is that obviously
19 you guys know that there's a lot of people out there who
20 don't like what we're doing, specifically to people who
21 have infringed on works and want to retaliate against
22 people who are enforcing copyrights.
23           Now, some people who infringe on works aren't
24 of a very serious, morally corrupt manner, but some of
25 them are people who are, you know, quite nefarious and

1  who are quite capable of committing quite a bit of harm.
2          AF Holdings makes use of corporate
3  representatives to help prevent the -- I guess the
4  officer, Mark Lutz, himself, from being targeted by
5  these individuals.  The manner in which Mr. Cooper was
6  designated as a corporate representative was Marks Lutz
7  asked attorney John Steele to arrange for a corporate
8  representative to acknowledge the assignment agreement
9  on behalf of AF Holdings.  Mr. Steele did so and
10 returned the assignment agreement to AF Holdings bearing
11 the signature of Mr. Alan Cooper.
12         When this whole -- I guess the first time we
13 heard about any form of controversy with respect to --
14 the first time AF Holdings heard about any form
15 controversy with respect to the assignment agreement was
16 when an attorney named Paul Godfread, G-O-D-F-R-E-A-D,
17 contacted AF Holdings and said that -- I can't remember
18 the exact text of the e-mail, but something to the
19 effect of he's representing someone named Alan Cooper
20 and they're concerned that Alan Cooper is being held out
21 as AF Holdings CEO.
22         And so when that occurred, we -- or AF
23 Holdings and Mark Lutz specifically, he asked, you know,
24 what is the exposure of AF Holdings here and there were
25 two specific concerns.  One specific concern was the

1    issue of fraud.  Namely, that if AF Holdings is
2    distributing agreements that have someone's signature on
3    it, but he didn't sign it or somehow his identity was
4    coopted, then obviously that's something that AF
5    Holdings would have to -- once it became aware of that
6    issue -- stop doing -- shut it down and make sure it
7    didn't happen anymore, because obviously there's no
8    reason to distribute an assignment or any agreement
9    bearing someone's signature if there was a forgery or
10   some sort of fraudulent action involved in that sense.
11           And so to address that issue AF Holdings --
12   well, spoke to Mr. Steele -- Mark Lutz spoke to
13   Mr. Steele and said, Well, I understand that there's an
14   issue with this Alan Cooper and asked Mr. Steele
15   point-blank, Is the signature a forgery.  Mr. Steele
16   said the signature is not forgery.  And he asked him, Is
17   the -- is this signature authentic.  Mr. Steele says,
18   yes, the signature is authentic.  Based on Mr. Steele's
19   representation, we have no reason to believe from what
20   Mr. Steele said, at least, that the signature is a
21   forgery or there's some sort fraud going on with respect
22   to the signature.
23           Then AF Holdings reached out to Paul Godfread
24   and said what, you know, evidence do you have of some
25   form of fraud or forgery or anything else.  Paul

1   Godfread did not -- was not responsive.  We further --
2   Mr. Steele further reached out to Paul Godfread and said
3   what can AF Holdings do to give your client the
4   assurances that we're not holding him out as somehow
5   being the CEO of AF Holdings.  And again Paul Godfread
6   was nonresponsive.  And so based on Mr. Steele's
7   representations that everything is authentic and Paul
8   Godfread's -- well, I guess, failure to give any
9   information regarding his client, plus this letter that
10  he filed that simply says that his client is being held
11  out as the CEO of AF Holdings, we concluded that at
12  least at this time there's not any evidence to support
13  some sort of concern of fraud or some sort of concern of
14  a forged or inauthentic signature.  And, of course, we
15  can't speak to Mr. Cooper directly because he's, of
16  course, represented by attorney Paul Godfread.
17         You know the second concern that was raised by
18  Mr. Godfread's inquiry was the issue of standing.
19  Namely, that if the worst case scenario played out and
20  the signature was inauthentic, would that somehow affect
21  our standing to proceed forward with cases.  When I say
22  our, I mean AF Holdings.  We looked at two different
23  things.  The first thing we looked at was the copyright
24  act itself, which says, of course, that the formal
25  requirements for a valid standing -- or a valid

1   assignment agreement are a written document, one, and
2   then that it's signed by the assignor.  So to give
3   ourselves close comfort with respect to the issue of
4   standing, we contacted the assignor, because obviously
5   the assignor -- Alan Cooper would be signing on behalf
6   of the assignee, of course.  And so we contacted the
7   assignor Raymond Rogers and asked him, you know, there's
8   this concern about Alan Cooper and who is Alan Cooper
9   and is his signature authentic or is his signature not
10  authentic, but can you confirm for us that you, in fact,
11  did sign this and you believe that the assignment is
12  effective and as far as you're concerned AF Holdings is
13  the owner of the copyright in question, in both this
14  case and of course the other copyright that Raymond
15  Rogers was involved in assigning to AF Holdings.  And he
16  did confirm that.  He said, yes, I do believe that this
17  agreement is authentic.  I entered into it voluntarily.
18  My signature is not forged.  Everything is fine from our
19  end.
20          And so that gave us comfort.  We also reviewed
21  Ninth Circuit case law, specifically the case of --
22  Cohen is in the title where the Ninth Circuit reviewing,
23  you know, section 204 of the Copyright Act concluded
24  that, Well, as long as you have a writing and it's
25  signed by the assignor, you have standing.

1   And then I guess the next action AF Holdings
2   is planning on taking to remove any doubt that the
3   assignment was and continues to be effective as between
4   AF Holdings and Heartbreaker, I guess, vice versa, is
5   they're preparing a ratification of the agreement, so
6   that without any Alan Cooper whatsoever that both the
7   Heartbreaker entities and then AF Holdings will confirm
8   that the assignment is intended to be effective through
9   the ratification.
10       Q.   Thank you for that very thorough answer.
11   Although you're jumping ahead a little bit to some
12   issues that I'm sure will come up eventually.  I would
13   like to come back to the more simple issue though of
14   just identifying who is this Alan Cooper that signed on
15   here.  Is the Alan Cooper whose signature on here the
16   same Alan Cooper who's represented by attorney Paul
17   Godfread?
18       A.   Well, first of all, I don't know who attorney
19   Godfread represents and who he doesn't represent.  If
20   you're talking about the guy who's in Minnesota and was
21   John Steele's former caretaker, all I can say is that AF
22   Holdings -- the only person who knows who this Alan
23   Cooper is is John Steele and we asked Mr. Steele, is
24   this the same guy, is this not the same guy, is there
25   another Alan Cooper and Mr. Steele declined to respond

1    on the basis that Mr. Cooper has sued Mr. Steele and
2    they're actively involved in litigation.
3         Q.   I believe you testified today throughout the
4    entire duration of AF Holdings duration -- AF Holdings
5    existence the only employee member, officer manager, the
6    person wearing all the hats and the only person who has
7    ever had any official capacity with AF Holdings is Mark
8    Lutz; isn't that correct?
9         A.   I testified that Mr. Lutz is the sole
10   manager/employee of AF holdings, correct.
11        Q.   And there's no other manager or employees
12   right through to this present day; is that correct?
13        A.   That's correct.
14        Q.   Mr. Lutz has been the only one.  So this begs
15   the question was John Steele ever an owner, manager or
16   employee of AF Holdings?
17        A.   No.
18        Q.   So why then did AF Holdings rely upon John
19   Steele to sign documents on AF Holdings' behalf?
20        A.   What document are you referring to that he
21   signed on AF Holdings' behalf?
22        Q.   Let me rephrase.  Why is AF Holdings relying
23   on John Steele to arrange for signatures on documents
24   that are being signed on AF Holdings' behalf?
25             MR. GIBBS:  Objection.  Calls for speculation.

1          THE WITNESS:  Well, it would be speculation as
2  to why AF Holdings took one action or another.  I would
3  say that, for example, you know, Mr. Lutz is an
4  individual.  There are a certain number hours in a day
5  and for him to accomplish everything he's going to
6  accomplish in any given day, or for anyone in any
7  capacity in any business, you rely on third parties to
8  aid you to accomplish various tasks.
9          For example, the -- Mr. Lutz relied on me
10 personally to arrange for the signature of Raymond
11 Rogers.  And the reason he did that was because he
12 needed me to help him out in that task.
13     Q.   So am I to understand correctly then that with
14 respect that AF Holdings litigation, you and Mr. Steele
15 are both taking orders from Mr. Lutz; is that correct?
16          MR. GIBBS:  Objection.  Misstates the prior
17 testimony.
18 BY MR. PIETZ:
19     Q.   He's your client, so on the issues --
20     A.   Mr. Lutz or AF Holdings?
21     Q.   Mr. Lutz is the client representative of AF
22 Holdings, so you, in your capacity as an attorney, and
23 Mr. Steele in his capacity as an attorney, are doing
24 what Mr. Lutz tells you to do; is that correct?
25          MR. GIBBS:  Objection.  Misstates testimony.

1    I just don't like the characterization.  Do whatever you
2    want to do.
3    BY MR. PIETZ:
4         Q.   Go ahead.
5         A.   I am not sure what you mean by we do what he
6    tells me to do.
7         Q.   If Mr. Lutz says settle a case, you as counsel
8    for the Alpha Law Firm, settle the case.
9         A.   Yes.
10        Q.   If Mr. Lutz says arrange to have this document
11   signed, you arrange to have the document signed; is that
12   correct?
13        A.   It depends on what document.
14        Q.   Well, for example, this copyright assignment
15   agreement that we're looking at as Exhibit A.  Mr. Lutz
16   told you to arrange to have it signed by Raymond Rogers
17   and you did that because Mr. Lutz is essentially the
18   client and your boss and you do what he tells you to do,
19   correct?
20             MR. GIBBS:  Objection.  Compound question.
21   BY MR. PIETZ:
22        Q.   Can you explain why that is not correct?
23        A.   Well, Mr. Lutz is not my client.  AF Holdings
24   is the client of Alpha Law Firm in certain matters.
25   When Mr. Lutz asked me to help facilitate that signature

1  as a logistical matter, I don't recall having -- you

2  know, acting in the capacity of an attorney.  I was just

3  assisting him facilitate it.

4        Q.   Did you ever work for Prenda Law, Inc.?

5        A.   No.

6        Q.   You were never attorney of record with Prenda

7  Law, Inc.?  You were never of counsel there?

8        A.   I guess I'd have to go back over the various

9  appearances that I filed.  I don't recall anything

10 specifically.  Does that mean that there's not one on

11 record somewhere, I can't say with exact certainty.

12       Q.   Was Mr. Lutz employed as a paralegal at Steele

13 Hansmeier?

14            MR. GIBBS:  Objection.  It's outside the scope

15 of the deposition noticed topics.

16            THE WITNESS:  Mr. Lutz was for a time employed

17 with Steele Hansmeier, yes.  What his exact title was, I

18 don't recall.

19 BY MR. PIETZ:

20       Q.   While he was employed at Steele Hansmeier you

21 were his boss, correct?

22       A.   I would not agree with that characterization.

23 The reason I wouldn't agree with that characterization

24 is because he worked directly under Mr. Steele.

25       Q.   So Mr. Steele was Mr. Lutz's boss at Steele

1    Hansmeier; is that correct?

2        A.   Yes.  Mr. Lutz reported to Mr. Steele in his
3    capacity of working for Steele Hansmeier.

4        Q.   And what did Mr. Lutz do for Mr. Steele at
5    Steele Hansmeier?

6            MR. GIBBS:  Objection.  Calls for speculation.

7            THE WITNESS:  I would -- you'd have to ask
8    Mr. Steele what specific duties Mr. Lutz performed.
9    BY MR. PIETZ:

10       Q.   Let me ask this question.  I'm asking for your
11   personal knowledge, not the knowledge of AF Holdings.
12   You were the other named partner on the masthead.  What
13   kind of tasks did Mr. Lutz perform at your law firm?

14       A.   Mr. Lutz did not perform any tasks directly
15   for me.  He performed tasks for Mr. Steele.

16       Q.   What kind of tasks did he perform?

17       A.   Again, you'd have to ask what kind of tasks
18   Mr. Lutz performed for Mr. Steele.

19       Q.   Would it be fair to characterize them as
20   paralegal-level tasks?

21       A.   I don't know if you could characterize them or
22   not because first you'd have to identify what they are.

23       Q.   And you have absolutely no idea what Mr. Lutz
24   did for Mr. Steele while working at your law firm; is
25   that correct?