UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

-----------------------------------------------------------
                        )
AF Holdings, LLC,       )   File No. CV-12-1445 (JNE/FLN)
                        )   File No. CV-12-1446 (JNE/FLN)
          Plaintiff,    )   File No. CV-12-1447 (JNE/FLN)
                        )   File No. CV-12-1448 (JNE/FLN)
vs.                     )   File No. CV-12-1449 (JNE/FLN)
                        )
John Doe(s),            )   Minneapolis, Minnesota
                        )   September 30, 2013
          Defendant(s). )   9:30 a.m.
                        )
-----------------------------------------------------------


BEFORE THE HONORABLE FRANKLIN L. NOEL
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**(EVIDENTIARY HEARING)**



<u>APPEARANCES</u>
 For the Plaintiff:        Class Action Justice Institute
                           PAUL R. HANSMEIER, ESQ.
                           40 South Seventh Street, #212-213
                           Minneapolis, Minnesota 55402

 For Witness Alan          Godfread Law Firm
 Cooper:                   PAUL A. GODFREAD, ESQ.
                           100 South Fifth Street, #1900
                           Minneapolis, Minnesota 55402

 Court Reporter:           LORI A. SIMPSON, RMR-CRR
                           300 South Fourth Street, #1005
                           Minneapolis, Minnesota 55415




    Proceedings recorded by mechanical stenography;
transcript produced by computer.

1                           <u>**I N D E X**</u>

                                                         <u>PAGE</u>

2      <u>JOHN STEELE</u>
         Direct Examination by Mr. Hansmeier              5
3        Examination by the Court                         29

4      <u>JASON FLESHER</u>
         Direct Examination by Mr. Hansmeier              34
5        Examination by the Court                         38

6      <u>BRENT BERRY</u>
         Direct Examination by Mr. Hansmeier              39
7        Examination by the Court                         41

8      <u>ALAN COOPER</u>
         Direct Examination by Mr. Hansmeier              43
9        Examination by the Court                         78
         Cross Examination by Mr. Godfread               80
10       Examination by the Court                         86
         Redirect Examination by Mr. Hansmeier           86
11
       <u>JOHN STEELE</u>
12       Further Direct Examination by Mr. Hansmeier      92
         Examination by the Court                         95

13

14

       <u>COURT EXHIBITS</u>                                  <u>REC'D</u>
15       1                                                62
         2                                                62
16       3                                                85

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **IN OPEN COURT** |
| 3 | THE COURT:  This is AF Holdings, LLC vs. John Doe |
| 4 | in several iterations, all of which are Civil Nos. 12-1445 |
| 5 | through 12-1449.  Let's get everybody's appearance on the |
| 6 | record.  Mr. Hansmeier. |
| 7 | MR. HANSMEIER:  Good morning, Your Honor.  Paul |
| 8 | Hansmeier for AF Holdings, LLC, the plaintiff. |
| 9 | THE COURT:  Okay.  It's my understanding -- let |
| 10 | me start over again.  So it's my understanding in 2012 |
| 11 | AF Holdings filed several lawsuits in this district, five |
| 12 | of which were assigned to me, the numbers I've just stated, |
| 13 | 12-1445 through 12-1449. |
| 14 | Attached to each complaint was a document |
| 15 | described in each complaint as a, quote, true and correct |
| 16 | copy, end quote, of the assignment agreement purporting to |
| 17 | be signed by Alan Cooper on behalf of either AF Films or |
| 18 | AF Holdings. |
| 19 | Eventually all five of these cases settled and |
| 20 | were dismissed by the plaintiff without any actual |
| 21 | litigation or motion practices occurring. |
| 22 | In one case in November of 2012 an attorney for |
| 23 | Alan Cooper filed a letter with the Court suggesting that |
| 24 | his client's identity was being misappropriated in |
| 25 | connection with these cases. |

1           When these cases were re-opened in July of 2013

2    Cooper's lawyer filed another letter in all five cases,

3    again suggesting his client did not sign the letter attached

4    as Exhibit B to each complaint and that he was not

5    associated with the plaintiff in these five cases.

6           This Court has concluded that it has the inherent

7    authority to investigate whether it was the victim of a

8    fraud and has scheduled this evidentiary hearing for the

9    sole purpose of determining whether Exhibit B to each of the

10   complaints in each of these five cases is authentic, that

11   is, whether it is, in fact, an assignment agreement signed

12   by Alan Cooper on behalf of either AF Holdings or AF Films,

13   as the case may be.

14          Plaintiff AF Holdings has the burden of

15   establishing that the documents are authentic.  So now,

16   Mr. Hansmeier, you're up.

17          MR. HANSMEIER:  Thank you, Your Honor.

18          THE COURT:  If you would come and use the podium,

19   I'd appreciate it.  Thank you.

20          MR. HANSMEIER:  Your Honor, if I may make a point

21   of clarification before I begin.  Is the Court focused

22   exclusively on the Alan Cooper signature or would the Court

23   also like me to perform the duty of authenticating

24   Mr. Rogers' signature as well?

25          THE COURT:  The order setting forth this hearing

1    set forth what I understand the issue to be, which is

2    whether the document which purports to be the assignment is

3    what it purports to be, an assignment signed by Alan Cooper

4    on behalf of AF Holdings and AF Films.

5              MR. HANSMEIER:  In that case, out of an abundance

6    of caution I will go through the process of authenticating

7    Mr. Rogers' signature.

8              Your Honor, I would like to call John Steele as a

9    witness.

10             THE COURT:  Okay.  Mr. Steele, do you want to come

11   forward, please, sir.  Raise your right hand, please.

12        (Witness sworn.)

13             THE COURT:  Have a seat and state your name and

14   spell your last name for the court reporter, please.

15             THE WITNESS:  John Steele, S-t-e-e-l-e.

16                        **(John Steele)**

17                     **DIRECT EXAMINATION**

18   BY MR. HANSMEIER:

19   Q.  Good morning, Mr. Steele.

20   A.  Good morning.

21             MR. HANSMEIER:  Is this machine on?

22             THE COURT:  Well, that's a very good question.

23   Have we got it fixed since the last time?

24             MR. HANSMEIER:  I think I have it here.

25   BY MR. HANSMEIER:

1   Q.  Mr. Steele, are you able to see this document on your

2   monitor?

3   A.  I'm seeing the top part of it.

4            THE COURT:  You might want to focus it a tad.

5   Maybe it's my eyes or maybe it's the monitor.  I'm not sure.

6            THE WITNESS:  There we go.

7   BY MR. HANSMEIER:

8   Q.  Mr. Steele --

9   A.  I can't really read the words, but I know this document.

10  Q.  Maybe I can zoom in a little bit for you.  Do you

11  recognize this document, Mr. Steele?

12  A.  Yes, I do.

13  Q.  And what do you understand this document to be?

14  A.  This is a Copyright Assignment Agreement between

15  Heartbreaker Films and AF Holdings.

16  Q.  And, Mr. Steele, I'll direct your attention to

17  paragraph 1.  Can you read the name of the work that this

18  assignment pertains to.

19  A.  "Sexual Obsession."

20  Q.  Now, Mr. Steele, I showed you one page of the document.

21  I'm now going to show you page 3 of the document, which is

22  the signature page of the document.  Mr. Steele, do you

23  recognize the name of the person purporting to sign on

24  behalf of the assignors?

25  A.  Yes.

```
1    Q.  And what is that name?

2    A.  Raymond Rogers or Ray Rogers.

3              MR. GODFREAD:  Your Honor, if I may, I would like

4    to state an objection on behalf of Cooper.  There's no

5    foundation as to how Mr. Steele would be able to testify as

6    to this document.

7              THE COURT:  Okay.  That objection is overruled.

8    BY MR. HANSMEIER:

9    Q.  And, Mr. Steele, do you know Mr. Rogers?

10   A.  I do.

11   Q.  And how do you know Mr. Rogers?

12   A.  Well, I first met him a couple years ago and I've

13   probably seen him in person five or six times.  I have

14   had various -- he was a client for a while with my law firm,

15   Steele Hansmeier.

16   Q.  Mr. Steele, how do you know what this document is?

17   A.  Well, I'm generally familiar with assignment agreements.

18   I'm familiar with obviously the issues raised by this

19   assignment agreement recently in this court and other

20   courts, if that's what you're asking.

21   Q.  Do you have knowledge of whether this assignment was

22   ever registered with the U.S. Copyright Office?

23   A.  Yes, yes.  I made arrangements for it to be registered.

24   I believe that was in 2011.

25   Q.  And, Mr. Steele, do you recognize the signature of
```

1    Raymond Rogers?

2    A.  Yes.

3    Q.  And how do you have a basis for knowing what Mr. Rogers'

4    signature looks like?

5    A.  Well, for one, I have seen him sign multiple documents,

6    including notarized documents.  I've been with him on

7    multiple occasions in which he has had to sign various

8    pleadings and paperwork and nonlegal-related documents.

9    Q.  And, Mr. Steele, as for Alan Cooper's signature, was the

10   use of Mr. Cooper's name authorized with respect to this

11   document, to your knowledge?

12   A.  Yes.

13   Q.  And how do you know that?

14   A.  Well, because I was the one that introduced Alan to the

15   owner of -- the controlling member of AF Holdings.

16   Q.  What date did you introduce Mr. Cooper to the person who

17   controls AF Holdings?

18   A.  It wasn't in person, it was over the phone, but it

19   was -- the first time was March 18, 2011.

20   Q.  And, Mr. Steele, how do you know -- how is your memory

21   such that you can remember that on March 18, 2011 you

22   introduced Mr. Cooper to --

23   A.  Well, because I knew it was sometime in March.  My

24   family went up to my cabin with me, both my daughters,

25   including my adult daughter, and I knew that the same day

1    that he had first talked to Mr. Lutz that we went to a place

2    called Jack's Shack that night and Mr. Cooper was with my

3    family that night and basically that was the night that --

4    that was the day that I know for a fact Alan first was, you

5    know, brought in to work with Mr. Lutz.

6    BY MR. HANSMEIER:

7    Q.  So we have it for the record, who is Mr. Lutz?

8    A.  That is the controlling member of AF Holdings.

9            THE COURT:  Just so the record is clear,

10   Mr. Hansmeier, the document we are talking about that you

11   currently have on the screen, have you marked that as an

12   exhibit?  From looking at your list, that would be

13   Exhibit 1; is that correct?

14           MR. HANSMEIER:  Your Honor, the list that I have

15   currently, I believe it's a bit different than the one that

16   was previously filed with the Court.  I'm not -- AF Holdings

17   is not attempting to enter anything into evidence today.

18           I understand we are performing the authentication

19   for the purposes of investigating issues before the Court,

20   but for our purposes the litigation over the infringement,

21   which is the purpose for what we, AF Holdings, originally

22   submitted the assignment, has been mooted by the settlements

23   that were --

24           THE COURT:  I understand your position.  I am just

25   trying to create a record.  And right now what we're going

1   to have is a screen that's going to disappear when you take

2   that document away.

3             MR. HANSMEIER:  I understand, Your Honor.

4             THE COURT:  And I need to have something in the

5   file so that an appellate court or somebody else looking at

6   this will know what we're talking about.

7             MR. HANSMEIER:  The document we're referring to

8   right now is ECF number 1-1 filed in case 12-CV-1445,

9   pages 4, 5, and 6 of that document.

10            THE COURT:  So just to be clear, you're not going

11  to mark this as an exhibit?

12            MR. HANSMEIER:  That's correct.

13            THE COURT:  All right.

14        (Discussion off the record between

15         the Court and the law clerk.)

16        (Pause.)

17            THE WITNESS:  Your Honor, may I have some water?

18            THE COURT:  Can you get the witness some water,

19  Mr. Hansmeier.

20        (Discussion off the record between

21         the Court and the law clerk.)

22            THE COURT:  Okay.  I'm going to mark it as an

23  exhibit as soon as I get my logistics located here, but you

24  can continue with your examination.

25            MR. HANSMEIER:  Thank you, Your Honor.

1    BY MR. HANSMEIER:

2    Q.  Mr. Steele, can you please describe the circumstances --

3    or let me back up for one moment.  Was this the first time

4    Mr. Cooper ever got involved with the sort of business in

5    this area, specifically referring to the clients you

6    represented in the copyright infringement law firm you had

7    started?

8    A.  No.

9    Q.  Could you please -- can you please run through some of

10   your history with Mr. Cooper in this regard.

11   A.  Okay.  Well, in late 2010 I -- well, every time I would

12   go up and see Alan at my cabin I would give him a little bit

13   of update and a little information about what I was doing

14   and he would do the same.  That's pretty standard.

15        At the end of 2010 I mentioned that someone I knew

16   was interested in sort of starting his own adult content

17   company and, you know, he was very excited about the

18   opportunities of that and Alan indicated that that sounds

19   like something that would be interesting to him.  He had

20   expressed some financial difficulties in the past that year

21   and so I offered, well, maybe I can help you a little bit,

22   get something started if you are interested.

23        And so we sat down and had a brief discussion

24   about setting up an entity for him to, you know, obtain

25   content and market it and obviously at some point if someone

1    stole it we were to go after them for stealing it.  That was

2    in the end of 2010.

3    Q.  Well, when did you first meet Mr. Cooper?

4    A.  When did I first meet Mr. Cooper?  I believe it was

5    November of 2006.

6    Q.  And who introduced you to Mr. Cooper?

7    A.  Brent Berry.

8    Q.  Is Mr. Berry here today?

9    A.  He is.  He's the person in the red/white/blue tie.

10   Q.  And what was the context of your meeting him?  What --

11   A.  Well, I owned a cabin with a bunch of property up in

12   northern Minnesota by Lake Mille Lacs and I went up there a

13   couple weekends a month or one weekend a month, whatever,

14   and recently there had been -- recent to then, 2006, there

15   had been some stuff stolen and some shenanigans on the

16   property because it's kind of in the middle of nowhere.

17        So I had expressed my concern to Brent and several

18   other people that were neighbors of mine up there and Brent

19   said that he knew someone who might be a good fit for being

20   a caretaker of my property.  I said, Oh, okay.

21        So I met Alan in, like I said, I believe it was

22   November, give or take, in 2006.  We worked out an

23   arrangement where he would live -- I have two cabins up

24   there.  One is a larger cabin.  One is like a smaller

25   original cabin.

1       And he could live in the smaller cabin rent-free

2    and I think all he covered was like electrical, whatever,

3    and just kind of keep an eye on the place, you know, making

4    sure people don't come and steal -- they had stolen a

5    generator, an outdoor huge generator, from my house a short

6    time before.

7       So originally the arrangement was that he was to

8    provide about 15 hours or so of work on the property each

9    month, but we never -- that was never followed through on,

10   but that's okay.

11      And so I would go up to my cabin regularly,

12   probably several times a month, and when I first -- I didn't

13   know Alan from a stranger when I first met him then, but,

14   you know, as we got to spend a lot of time together and then

15   started slowly developing a friendship.

16   Q.  How close of a friendship did you have -- how close of a

17   friendship developed between 2006 when you originally met

18   him and say the end of 2010 when you arranged or you

19   discussed a business deal with him?

20   A.  Well, I mean, it was a multiyear process.  I would say

21   that our relationship got a lot closer in I think it was

22   like 2007 because I had recently gone through a divorce.

23   Mr. Cooper was dealing with a similar situation that was

24   very stressful for him.

25      He didn't have a lot of experience in the legal

1    field.  So this was very overwhelming for him, I feel like.

2    And I didn't give him legal advice, I certainly wasn't his

3    attorney, but I just basically was a friend to talk to about

4    concerns he had, especially about his daughter and so on,

5    custody and all that.

6            So I would say a lot of the times I would go up to

7    the cabin, especially after -- between 2007 and, say, 2009,

8    I would go up mostly by myself or with my adult daughter and

9    we had a lot of common interests.  You know, we both liked

10   going out in the woods and hunting or four-wheeling,

11   snowmobiling, all that kind of stuff.

12           So it just naturally happened.  I mean, we would

13   spend a lot of time going on day trips together to places

14   and go to restaurants, you know, bars and that kind of

15   thing.  Whenever I was up there he would always kind of come

16   along if he was there.  I would say we were pretty good -- I

17   would say we were very good friends by 2010.

18   Q.  You previously testified that in 2010 you formed a law

19   firm to fight, quote, unquote, digital piracy and you

20   identified the name of the firm to be Steele Hansmeier.  Did

21   you discuss your business with Steele Hansmeier with Alan

22   when you went up north?

23   A.  I would say just in the beginning just the bare

24   outlines, you know, what kind of litigation.  I was no

25   longer doing much with family law, you know, that kind of

1    stuff.

2         Once we started talking more about, you know, him

3    working or doing something, you know, as a potential client

4    or preclient or whatever you want to call it, then we got

5    into more details about, you know, how the piracy works, how

6    that works, how -- what I've learned from other people, you

7    know, other clients as far as in general how the market is

8    or how the industry is and all that.  I don't know if that's

9    what you're asking.

10   Q.  What was Mr. Cooper's reaction when he heard about

11   whatever aspects of the business you discussed with him?

12   A.  Well, I guess he was pretty excited about the idea of

13   trying to generate some kind of additional income.  I don't

14   know the exact timeline of his employment, but I know he had

15   some -- he was laid off I believe early that year or

16   sometime around there and he was always, you know,

17   discussing how he had financial issues and I think he saw it

18   as an opportunity to -- another revenue stream.

19   Q.  And you previously testified that you helped him form a

20   company to do this.  What was the name of that company?

21   A.  VPR, Inc.

22   Q.  And where was the company registered?

23   A.  I would have to double-check.  I can't remember off the

24   top of my head.  I mean, if I were to see some documents

25   from the incorporation I could tell you.

1    Q.  Would it surprise you if it was incorporated in Nevada?

2    A.  That sounds right.

3    Q.  What happened to that company?

4    A.  Well, pretty quickly after the formation and setting up

5    of I think a website it was apparent that Alan didn't have

6    the time or drive to really do anything and it was difficult

7    to reach him at times and so we just -- it just kind of went

8    and did nothing.  It never -- to the best of my knowledge

9    never filed any kind of litigation, never did any sort of

10   commerce.  Eventually I think I was made aware -- I think it

11   was just shut down.  I think it was just ended.

12   Q.  What else did you do to help him get the company

13   started?

14   A.  Well, I believe the website URL, I think I helped only

15   to the extent of creating like a URL with like a website

16   provider or whatever.  I didn't do anything with the website

17   itself.  I don't know how to make a website, but I have a

18   lot of experience having, you know, formed -- like when you

19   go to GoDaddy or wherever you can make like a URL and

20   register that.  So I did that part.

21   Q.  What name did you register the account under?

22   A.  My name.  At first, yeah, when I first set it all up it

23   was under my name and then later on when, you know, Alan

24   was -- I believed that it was going to go forward I

25   transferred it into his name and we went from there.

1    Q.  What happened after that?

2    A.  Well, I'd say a few months later, you know, I was back

3    at my cabin, one of the times I was up there.  And I didn't

4    really care one way or another that Alan didn't want to

5    proceed.  He acted like, you know, he still was interested

6    in some form or fashion.  I think he got a big kick out of

7    being associated with this industry, the adult industry.

8          And I feel like he kind of apologized for not

9    being completely available and he made it clear to me that

10   he wasn't always going to be as available because of his

11   work.  I guess he has work that's part of the year.  He

12   works in the summer and not in the winter or whatever.

13         So I suggested, well, my friend that you know

14   about that's setting up this company is looking for people

15   to help him to get his thing off the ground and, if you want

16   to, I can put you in touch with him and you guys can go from

17   there.

18   Q.  And you are referring to Mr. Lutz now?

19   A.  Correct.

20   Q.  And what was Alan's reaction to that?

21         MR. GODFREAD:  Your Honor, I would object again as

22   to hearsay as to what Mr. Cooper may or may not have said.

23   He is here to testify.

24         THE COURT:  Overruled.

25         THE WITNESS:  Could you repeat the question?  I'm

1    sorry.

2    BY MR. HANSMEIER:

3    Q.  What was Alan's reaction to your suggestion that he get

4    in touch with Mr. Lutz?

5    A.  He said, Yeah, sounds good.  And so I called up -- it

6    was like the afternoon or whatever that day.  I called up

7    Mark and said, Hey, I'm up here.  I had actually spoken to

8    Mark earlier that day.  I said, Hey, Alan is here.  And

9    basically I only heard, you know, one-half of the

10   conversation, obviously, because when I handed my phone to

11   Alan, I mean, I didn't hear what Mark said.

12   Q.  After that date, which I believe you testified was

13   March 18, 2011 --

14   A.  I believe so, yes.

15   Q.  -- did you ever have any other conversations with Alan

16   about his involvement with AF Holdings or with any other

17   companies for that matter?

18   A.  Well, sure.  I mean, Alan loved to talk about it,

19   especially maybe after a beer or two at the campfire.  He

20   often, you know, would make -- I took it as being joking,

21   but he would make comments about how he would be the big

22   star in his own production and he was going to introduce a

23   new line of redneck porn and all that kind of stuff.

24         So he was very -- and he also liked -- I mean, he

25   would offer, I think jokingly, but he would offer jobs to

1    people, including my own adult daughter, oh, you should come

2    work for me now that I'm a big, you know, porn tycoon and

3    all that kind of stuff.

4           So I don't think he was certainly -- I don't think

5    in any way he was embarrassed or shy about making it clear

6    that he was involved with these different entities.

7    Q.   What happened to your practice with Steele Hansmeier?

8    A.   We closed -- I closed, along with my partner, Steele

9    Hansmeier I believe it was November -- well, there's a

10   transition period, but basically November of 2011 was when

11   the transition started and I think it might have taken a

12   month or two or whatever to move clients to the new firm.

13   Q.   And why did you close the practice?

14   A.   Well, I think the biggest reason I closed it is I was,

15   quite frankly, surprised at the just vitriol and nastiness

16   involved with the pirates that we were pursuing.  See, we

17   didn't know the identities of the pirates in the early

18   stages, so they could basically do whatever they really

19   wanted and no one knew who they were.

20          So, for instance, one day I was directed by

21   someone else to look at a website that had a blog post with

22   pictures of my house, including my three-year-old daughter,

23   and the discussion was what would be the best caliber of

24   bullet to murder John's family.

25          So I said this isn't worth it, this is stupid.

1    And so eventually what I did was I helped transition over

2    the clients that we had at the time to a new law firm owned

3    by a different attorney in Chicago named Paul Duffy.

4    Q.  At the end of 2012 what was the status with your cabin?

5    I apologize.  At the end of 2011 what was --

6    A.  At the end of 2012 it was sold.

7              MR. GODFREAD:  Your Honor, I would object again as

8    to relevance.

9              THE COURT:  The objection is overruled.  Actually,

10   until your client is on the witness stand you don't really

11   have any standing to object to things at this point.  So you

12   are here to represent your client when he testifies.

13             MR. GODFREAD:  Thank you, Your Honor.

14             THE COURT:  Mr. Hansmeier.

15   BY MR. HANSMEIER:

16   Q.  Mr. Steele, you testified --

17             THE COURT:  I'm sorry.  I got confused.  So the

18   last testimony I heard was the cabin was sold at the end of

19   2012.  Is that what you were trying to elicit?

20             MR. HANSMEIER:  Yes.  I'm discussing the process

21   of that sale, that's what I am going forward to, which will

22   go to motive.

23   BY MR. HANSMEIER:

24   Q.  Mr. Steele, you testified that you sold your cabin

25   sometime near the end of 2012?

1    A.  I don't know the exact -- if I saw any documents or

2    perhaps -- Brent Berry was the person who handled the sale

3    of it, so he would probably be better suited to know exactly

4    when the sale day was.

5    Q.  What I'm interested in discussing with you, Mr. Steele,

6    is the process of the sale.  Can you walk me through, for

7    example, what date did you -- on or around what date did you

8    decide to initiate the sale of your cabin?

9    A.  That's easy.  It was July 4, 2012, that week.

10   Q.  And what factors led you to decide to sell your cabin?

11   A.  I wasn't able to go up there very much because I no

12   longer lived in the Midwest.  It's a lot of money to upkeep

13   a property that large.  It's 120 acres with two large homes

14   on it.  And I had just spent a large amount of money to get

15   my cabin ready for my extended family to come up there and

16   it was just such a hassle I decided, you know what, let me

17   sell this cabin.  It's a nice property and I just wasn't

18   really getting the use out of it.

19   Q.  And what was Mr. Cooper's reaction to the news that you

20   were considering selling your property?

21   A.  Well, the first couple days when I was still up there --

22   I was up there a few days after I told Mr. Cooper -- his

23   attitude was kind of like he didn't really take me

24   seriously, you know, because I hadn't mentioned it before.

25         And then once we started making concrete plans,

1    there was a big sign that went up on the property because it

2    was an auction, there was people coming to the property to

3    fix things up, potential buyers and so on, Alan became very

4    angry and there was a very hostile turn of the relationship,

5    I guess, between me and him.

6    Q.  And what were some of the manifestations of that

7    hostility?

8    A.  Well, it started -- I mean, it wasn't like it went from

9    day one he was fine and day two he was extremely upset.  It

10   was a gradual process.

11        He started asking me for many different

12   possessions on the property.  He kept asking me constantly

13   for different items could he have.  And I said, Alan, it is

14   going to be at the auction.  I really don't want to -- I

15   gave him a few things just because fine.

16        But he started complaining to me that he didn't

17   have a lot of options and places to go because he had been

18   living for free at my property for six years or so and that

19   he -- I really got the impression, based on his comments to

20   me, that he was starting to blame me.  He was like, You've

21   got to help me get situated because I'm going to end up

22   living on my dad's couch.  And I felt sorry for him, I know

23   he had a child he lived with, but I told him, Alan, that's

24   really not my problem.

25        And at that point it became very awkward because

1   Alan -- whenever people would come on the property Alan

2   would start threatening them.  He would tell them that the

3   property is really a bad thing, don't buy it.  He went to

4   various places in the community and told them this thing is

5   going to fall over, it's a really bad place.  We actually

6   lost one buyer in particular just because of that, I

7   remember.

8        And I found out after the fact that he had been

9   doing some more direct damage and destruction to my

10  property, which I didn't know at the time because I was

11  living in Florida.

12       But one of the things he did was he decided to

13  take a chain saw to the interior walls of my cabin.  He

14  removed almost all the walls there without any permission.

15  It clearly decreased the value of the cabin.

16       He stole quite a bit of items from my pole barn.

17  He actually used my own trailer to do it, from what I

18  understand.  He took a great deal of wood off the property,

19  cut it down and bundled it off to wherever he was going.  It

20  just -- stuff like that, on and on.  It was a very

21  frustrating period.

22       For instance, my own real estate guy, he went up

23  there to get the house ready and at one point Alan, from my

24  understanding, chased him around threatening to kill him.

25  He had to run to his car to get away from the property.

1          I spoke to Alan that same day about 20 minutes

2     later after that incident and I said, You can't be doing

3     this to people.  He was literally in tears saying he was so

4     sorry for what he had done.  I understand that he sent many

5     texts and called the broker in question and apologized.

6     I've seen the text, so I know that he actually did that.

7          And that's -- at the time of the sale that's all I

8     knew.  He also did some more things later, but --

9     Q.  What were some of the things he did later after the

10    sale?

11         THE COURT:  Let's move on, Mr. Hansmeier.  The

12    issue here is whether he signed the documents or not.  And I

13    understand you've got some motive evidence you want to get

14    in, I understand there is bad blood between these gentlemen,

15    but we have been going for 30 minutes and we haven't really

16    talked about the document and Mr. Cooper's signature at all.

17    So if you've got some other questions, move to those,

18    please.

19         MR. HANSMEIER:  I have one final question on this

20    line of questioning and then I'll move on, Your Honor.

21    BY MR. HANSMEIER:

22    Q.  Did Mr. Cooper -- there was one other event that you

23    might be aware of.  What is that event?

24    A.  I became aware, by a couple people, in late 2012 that

25    Alan Cooper was spreading a rumor that I had molested his

1   daughter.

2   Q.  Mr. Steele, do you recognize this document?

3   A.  I do.

4   Q.  What is your understanding of what this document is?

5   A.  This is a Copyright Assignment Agreement.

6   Q.  And who are the parties to the assignment, if you can

7   read it?

8   A.  Heartbreaker Digital and AF Holdings.

9   Q.  And can you read the name of the work?

10  A.  "Popular Demand."

11  Q.  Mr. Steele, this is the second page of the assignment

12  agreement relating to "Popular Demand."  Do you recognize

13  the name of the person purporting to sign on behalf of the

14  assignor?

15  A.  Yes.  That's Raymond Rogers' signature.

16  Q.  And is this signature consistent with -- or how do you

17  recognize Raymond Rogers' signature?

18  A.  Well, as I stated, I've seen him sign multiple

19  documents, including at least one I can think of that was

20  notarized.  I have had -- I mean, I have had meals with him.

21  He's signed credit card receipts.  I've seen other documents

22  he had to sign for Steele Hansmeier.  He's signed documents

23  in front of me when I was visiting him in Las Vegas.

24  Q.  And, Mr. Steele, is this the document -- is this

25  document the assignment -- is this a genuine representation

1    of the assignment that AF Holdings would have submitted to

2    the U.S. Copyright Office?

3    A.  Yes.

4    Q.  And how do you know that?

5    A.  Because I believe I was the one that made the

6    arrangements to have this entered in the U.S. Copyright

7    Office.

8    Q.  So you personally saw the document that was submitted to

9    the U.S. Copyright Office?

10   A.  Yes.

11   Q.  And this is a fair and accurate representation of that

12   document?

13   A.  Yes.

14   Q.  Would the same be true for the assignment for "Sexual

15   Obsession"?

16   A.  Yes.

17   Q.  Now, Mr. Steele, focusing specifically on the person

18   purporting to sign on behalf of the assignee, do you

19   recognize the name?

20   A.  Of course.  It's Alan Cooper.

21   Q.  Now, Mr. Steele, do you know if Mr. Cooper personally

22   signed this himself?

23   A.  No.

24   Q.  Do you believe that he personally signed it himself?

25   A.  I don't know.  I would have to see if -- I would have to

1    know more, like if he was around at that time or available.

2    Q.  Well, Mr. Steele, if Mr. Cooper did not sign the

3    document himself, how could his name have appeared on the

4    document?

5    A.  Well, it's my understanding that he had given authority

6    to Mark and his people if he wasn't available, that he could

7    sign the various documents as long as he understood what the

8    document related to as far as -- you know, for instance, my

9    understanding was he couldn't just sign a car title or

10   something.  It had to be related to specifically this

11   related -- this type of paperwork.

12   Q.  So Mr. Cooper gave his authorization to Mark Lutz for

13   the use of his name in connection with --

14   A.  Yes.

15   Q.  -- these companies?

16   A.  Absolutely.

17   Q.  And do you have any reason to believe that the use of

18   Mr. Cooper's name on this document or on the assignment for

19   "Sexual Obsession" was not authorized?

20   A.  Absolutely not.

21   Q.  And you've previously testified that you heard

22   Mr. Cooper bragging about his relationship with these

23   companies, offering people jobs.  Were there any other

24   manifestations of Mr. Cooper's knowledge of his involvement

25   with these companies?

1    A.  Well, I mean, he told -- other than telling people the

2    details of the company and various settlements and various

3    things like that, I mean, he talked about it.  Whenever we

4    would get together he would joke about it.  I know that at

5    some point he told his wife or -- I don't know if they were

6    married at the time, but the person living with him.  I

7    think her -- I don't know her last name.  Charity was her

8    first name.

9    Q.  And, Mr. Steele, did Mr. Cooper ever express any concern

10   or discomfort to you personally with respect to the use of

11   his name in connection with these companies?

12   A.  No.  I think that -- no to that question.  I mean, I

13   know that he complained once to me about the pain in the

14   butt of sometimes getting to -- you know, dealing with phone

15   calls or getting to a document or having something notarized

16   or something like that.  But I said, Well, whatever, you

17   know, your attorney says you have to do, it's for a reason.

18   Q.  That's all I have for you, Mr. Steele.

19             MR. HANSMEIER:  Thank you.

20             THE COURT:  Keep your seat.  You're not done.

21             Let me have the two assignments that you've been

22   talking about.

23             MR. HANSMEIER:  Let me get the second one here.

24             THE WITNESS:  May I get some more water, Judge?

25             THE COURT:  Sure.

1        MR. HANSMEIER:  I'll get you some water.

2        THE COURT:  These are photocopies, correct, these

3   aren't original assignments?

4        MR. HANSMEIER:  These are not the originals.

5        THE COURT:  Okay.

6                          **EXAMINATION**

7   BY THE COURT:

8   Q.  All right.  Mr. Steele, I am going to show you what your

9   lawyer showed you earlier or Mr. Hansmeier showed you

10  earlier, which I have marked as Exhibit 1.  Is that a

11  photocopy of the Copyright Assignment Agreement for the work

12  known as "Sexual Obsession"?

13  A.  Yes.

14  Q.  And that's the document that you previously looked at

15  and testified about in response to Mr. Hansmeier's

16  questions?

17  A.  Yes.

18  Q.  And that was the document that was attached as Exhibit B

19  to the complaint that was filed in Civil No. 12-1445 and

20  12-1448; is that correct?

21  A.  I have no idea.

22        THE COURT:  Okay.  Mr. Hansmeier, do you know if

23  that's the --

24        MR. HANSMEIER:  That is correct, Your Honor.

25  BY THE COURT:

1   Q.  And my understanding is you did not see Alan Cooper sign

2   that document; is that correct?

3   A.  This document?  No.

4   Q.  As I understood your testimony, you said you had an

5   understanding that Cooper had authorized Lutz to sign

6   documents on his behalf.  Was that your testimony?

7   A.  Not exactly.  I didn't have an understanding with

8   Mr. Cooper.  Mr. Cooper and Mr. Lutz had an understanding

9   and to the extent -- I don't know if it was only with --

10  Q.  Let me interrupt you.  What -- on what do you base what

11  you know or what you have testified about regarding an

12  agreement between Lutz and Cooper?

13  A.  Well, based on the two phone calls that I was present at

14  where Mr. Cooper spoke to Mr. Lutz, once on March 18th, I

15  believe, and once that was later on in the year.  It would

16  have been -- I would have to look at my records, but I

17  believe it was around November or so of the same year.

18  Q.  Those are two phone calls that you testified you only

19  heard Mr. Cooper's end of the conversation?

20  A.  Yes.

21  Q.  And did you hear Mr. Cooper give Mr. Lutz authority or

22  permission to sign his name to documents?

23  A.  Yes.

24  Q.  Tell me what he said.

25  A.  Well, to the best of my -- it's been a couple of years,

1    but he said, Well, I'm not always going to be available, I'm

2    not always around, I don't have a fax machine, things like

3    that, to that effect, I won't be -- I got the impression,

4    look, I am not going --

5    Q.  I don't want your impressions.  I want to know what you

6    heard Mr. Cooper say.  Did you hear Mr. Cooper say,

7    Mr. Lutz, you can sign my name to documents as needed?

8    A.  No.  He said, If I'm not available and it's a document

9    relating to, you know, an assignment agreement or, you know,

10   relating to these companies, go ahead and send -- you know,

11   sign on my behalf, but don't -- and he made some comment

12   about, Don't use it outside of these companies.  It was kind

13   of like a joke.  He was laughing when he said that, the

14   second part where he said, Don't use it to, you know, buy a

15   car or something.

16   Q.  Have you ever seen Mr. Lutz's signature?

17   A.  Yes.

18   Q.  Do you know whether Mr. Lutz is the person who signed

19   the Alan Cooper name on Exhibit 1?

20   A.  No, I don't know.

21   Q.  Do you know who signed Alan Cooper's name to Exhibit 1?

22   A.  No.

23   Q.  All right.

24   A.  I wasn't the attorney on any of those cases.  I wouldn't

25   have handled that.

1    Q.  Do you know if Alan Cooper had a position in AF Holdings

2    or AF Film?

3    A.  The only position I was aware of was just as like a

4    helper.  He had no, like, authority or he wasn't like the

5    CEO or president or anything.  He was just assisting Mark in

6    getting -- you know, like an entry level, you know, just

7    helping Mark, from my understanding based on what I -- based

8    on my conversations both with Mark and with Mr. Cooper.

9    Q.  Beyond the two telephone conversations about which you

10   testified?

11   A.  Well, sure.  I talked to Alan directly when we were

12   together about various matters and I certainly had spoken to

13   Mr. Lutz in 2011 about it.

14   Q.  Was AF Holdings a client of yours?

15   A.  At the very -- towards the very end of our -- yes.  I'm

16   sorry.  The short answer is yes, but I don't know if Steele

17   Hansmeier ever filed any lawsuits for them because it was at

18   the end of the firm being open.  I don't know if that makes

19   sense.  I could --

20   Q.  So it's your understanding that Alan Cooper -- let me

21   rephrase that question.  Did Alan Cooper -- was Alan Cooper

22   employed by AF Holdings?

23   A.  I don't know if he was employed officially by

24   AF Holdings.  I couldn't tell you.  I have no interest or

25   involvement or ownership with AF Holdings.

1    Q.  Do you know if he received income from AF Holdings?

2    A.  I do not know.

3    Q.  Is there such a thing as AF Films, by the way?

4    A.  I believe that was an earlier -- like a typo or

5    something, because I noticed that.  When I was preparing

6    yesterday I realized that it looks like there was a typo,

7    because it's my understanding this relates to AF Holdings

8    and I believe -- yeah, it says it in the agreement.

9    Q.  Just to be clear, then, as to Exhibit 1, is it your

10   testimony that you do not know who signed the Alan Cooper

11   name on Exhibit 1?

12   A.  Yes, Your Honor.

13   Q.  I'm going to show you Exhibit 2.  Do you recognize that?

14   A.  Yes.

15   Q.  Is that the second assignment about which Mr. Hansmeier

16   was asking, which is the assignment related to a work called

17   "Popular Demand"?

18   A.  Yes.

19   Q.  And same questions.  Do you see the Alan Cooper

20   signature on that document?

21   A.  I do.

22   Q.  And do you know if Alan Cooper signed that document?

23   A.  I would guess that he did not because it doesn't look

24   like his signature.

25   Q.  And do you know who did sign the Alan Cooper signature

1    on that document?

2    A.  No.

3              THE COURT:  Any other questions, Mr. Hansmeier?

4              MR. HANSMEIER:  Not for this witness, no, Your

5    Honor.

6              THE COURT:  Thank you.  You're excused.

7              THE WITNESS:  Thank you, Your Honor.

8              THE COURT:  Next witness.

9              THE WITNESS:  Your Honor, would you like these

10   back?

11             THE COURT:  Yes.  Put those right down there.

12   Thank you.

13             MR. HANSMEIER:  Your Honor, I would like to call

14   Jason Flesher to the stand.

15             THE COURT:  I'm sorry.  Who is this?

16             MR. HANSMEIER:  Jason Flesher.

17             THE COURT:  Come forward and get sworn in, please,

18   sir.  Raise your right hand.

19       (Witness sworn.)

20             THE COURT:  Have a seat.  State your name and

21   spell your last name for the court reporter, please.

22             THE WITNESS:  Jason Patrick Flesher,

23   F-l-e-s-h-e-r.

24                         **(Jason Flesher)**

25                       **DIRECT EXAMINATION**

1    BY MR. HANSMEIER:

2    Q.  Good morning, Mr. Flesher.

3    A.  Good morning.

4    Q.  Thank you for attending today.  Mr. Flesher, how long

5    have you known Alan Cooper?

6    A.  To the best of my knowledge, four to five years.  I had

7    begun spending time up at the cabin with John, again I'm

8    guessing, 2009 and 2010 and I believe that's when I first

9    met Alan.

10   Q.  And how would you describe John and Alan's relationship

11   prior to 2012?

12   A.  Very close.  It was -- I can't count the number of times

13   we were -- we would all spend time hanging out together.

14   They would have full wrestling matches out in the yard.

15   Heard them both refer to each other as brother at one point

16   or another.  Very close from what I recall.

17   Q.  And when you visited the cabin in 2009 or 2010, what

18   would you guys do when you went up there?

19   A.  Oh, a lot of four-wheeling, spent some time shooting.

20          THE COURT:  Mr. Hansmeier, give me a preview.

21   Where are you going with this and what's it going to -- how

22   long is it going to take and what's it going to cover?  It

23   sounds to me like we're not getting to the documents.

24          MR. HANSMEIER:  Well, Your Honor, it's going to go

25   towards the authorization that Alan had given Mr. Lutz to

1    use his name in association with the companies.

2    Specifically it's going to go to Mr. Flesher's testimony

3    that he heard Alan engaged in conversations about his

4    involvement with these companies and it's going to go to

5    Mr. Flesher's recollection of a lot of fights that Alan had

6    with his then wife about his involvement with these

7    companies.

8              THE COURT:  Is there going to be any testimony

9    that Alan Cooper acknowledged signing documents on behalf of

10   AF Holdings or authorizing Mr. Lutz to sign his name on

11   behalf of AF Holdings, or is it going to be more he was a

12   porn king?

13             MR. HANSMEIER:  It's going to go to him -- it's

14   going to go to the implausibility of his current position,

15   which is that he has no recollection of being involved with

16   any porn company whatsoever; and that is how he testified

17   both in courts in Minnesota, in courts in California, and in

18   courts nationwide.

19             And so when he comes on the stand and testifies

20   that he has no knowledge of being associated with any porn

21   company whatsoever, it's this testimony which will go

22   against the veracity of what Mr. Cooper's narrative is.

23             THE COURT:  Make it short.  Make it quick.

24             MR. HANSMEIER:  I will.

25             THE COURT:  Get that testimony out and then move

1    on.

2                    MR. HANSMEIER:  I will, Your Honor.  Thank you.

3    BY MR. HANSMEIER:

4    Q.  Mr. Flesher, let's just cut to the chase, then.  Is it

5    plausible to you that Mr. Cooper is not aware that he was

6    involved with a porn company prior to November 2012?

7    A.  No, it's not based on a conversation I had.  On one of

8    my visits up there in 2011 I talked to his wife Charity.

9    Generally when we would come up to the cabin she would -- we

10   would usually have a kind of debriefing.  She would go over

11   what was bothering her or what was going on.

12                   The particular event I'm talking about now, she

13   had expressed she was very angry that John had involved Alan

14   as -- I don't recall her exact words, but as the head of a

15   porn company basically.  She was angry that he was involved

16   in this.  I'm not sure if the anger was more based around

17   she felt that he wasn't able to function in this position or

18   just the people he would be around, but.

19   Q.  Was there any indication from her that Alan was involved

20   in signing documents?

21   A.  She didn't say anything along those lines.

22   Q.  And is there anything else you can tell us about your

23   conversations with her regarding Alan's involvement with

24   porn companies?

25   A.  No.  Just that she was angered about it.  I guess what

1     struck me about it is if she knew about it -- John and

2     Charity probably said five words to each other in a good

3     year.  They were oil and water, didn't get along.  So I

4     guess what strikes me funny about this whole thing is if she

5     knew about it, how Alan would be unaware of it because that

6     would have been the only avenue I can think of that she

7     would have found out.  I don't know how else she would be

8     aware of it and he wouldn't and be -- if she was and he

9     wasn't, why she wouldn't have let him know that he was

10    involved in this.

11    Q.  Thank you, Mr. Flesher.

12          MR. HANSMEIER:  That's all I have, Your Honor.

13          THE COURT:  Thank you.  You're excused.  I'm

14    sorry.  One more question, Mr. Flesher --

15          THE WITNESS:  Yes, Your Honor.

16          THE COURT:  -- just to make sure I cover the

17    bases.

18                          **EXAMINATION**

19    BY THE COURT:

20    Q.  I am showing you what has been previously marked as

21    Exhibit 1.  Have you ever seen that before?

22    A.  No, I have not, Your Honor.

23    Q.  I'm showing you Exhibit 2.  Have you ever seen that

24    before?

25    A.  No, I have not, Your Honor.

```
 1    Q.  Are you familiar with Alan Cooper's signature at all?

 2    A.  No, I am not.

 3              THE COURT:  Thank you.

 4              Next witness.

 5              MR. HANSMEIER:  I would like to call Brent Berry.

 6              THE COURT:  Mr. Berry, do you want to come

 7    forward, please, sir.  Raise your right hand.

 8         (Witness sworn.)

 9              THE COURT:  Have a seat.  State your name and

10    spell your last name for the court reporter, please.

11              THE WITNESS:  Brent Berry, B-e-r-r-y.

12                          (Brent Berry)

13                        DIRECT EXAMINATION

14    BY MR. HANSMEIER:

15    Q.  Mr. Berry, we are going to go through a truncated

16    version of this in light of the Court's concerns regarding

17    timing.

18              How would you describe Alan's relationship with

19    the cabin?

20    A.  He was a good caretaker since '06.

21    Q.  And how did he react when he found out he was -- that

22    the cabin was for sale and he was going to have to leave?

23    A.  For the first couple of days good and then it just

24    escalated.

25    Q.  And what do you mean by "escalated"?
```

1   A.  It just turned, you know, not nice, volatile.  It was

2   just -- he was not happy, basically.  He loved that place.

3   He loved it to death.  That's what I can tell you.

4   Q.  And can you walk me through the incident where

5   Mr. Steele described Alan chasing you off the property.

6   A.  It was actually the portion of that -- we left.  I mean,

7   we had an argument together and it just didn't seem like it

8   was going to be healthy for me to be there, you know, one of

9   three to four different instances that I was, you know, in.

10  So we packed up and left.

11  Q.  And did you report that incident to the police?

12  A.  That one I actually did.  I had just called an officer.

13  It was not an official report, but I called Aitkin County.

14  Q.  And Mr. Steele previously testified that Mr. Cooper was

15  spreading rumors about accusations of sexual abuse.  Around

16  what time were you -- did you become aware of those

17  accusations?

18  A.  December.

19  Q.  Of what year?

20  A.  December -- that would have been '13.  No, December '12.

21  It wasn't '13 yet.  So December 2012.  I had just got back

22  in touch with him and we talked and then, again, we got

23  into, you know, some conversation and he had mentioned it

24  and he said that he had thought that John had sexually

25  abused his daughter.  And I was like, What?  And then I got

1    really mad.  I just thought that was ridiculous.

2    Q.  Just so I'm clear, you're saying this is December of

3    2012?

4    A.  Yeah.

5    Q.  And do you believe there's any credibility to

6    Mr. Cooper's rumor about John, that John was sexually

7    abusing his daughter?

8    A.  No.

9    Q.  None whatsoever?

10   A.  None whatsoever, no.

11          MR. HANSMEIER:  That's all I have for this

12   witness, Your Honor.

13          THE COURT:  Thank you.  You're excused.  Oh, I'm

14   sorry.  Let me ask a couple of questions.

15                        **EXAMINATION**

16   BY THE COURT:

17   Q.  I'm going to show you what's been marked as Exhibit 1 by

18   the Court.  Have you ever seen that document before?

19   A.  No.

20   Q.  Exhibit 2, have you ever seen that document?

21   A.  No.

22   Q.  Have you ever seen Mr. Cooper's signature?

23   A.  Yes.

24   Q.  Would you recognize it if you saw it?

25   A.  Probably not.  I was his realtor and I sold his house

1    for him, but I wouldn't recognize it if I saw it today.

2    Q.  I am going to show you Exhibit 1.  There's a line that

3    purports to be the signature of Alan Cooper.  Do you know

4    whether that's Alan Cooper's signature?

5    A.  I do not.

6    Q.  Showing you Exhibit 2, there's a line on page 2 that

7    purports to be the signature of Alan Cooper.  Do you know if

8    that's Alan Cooper's signature?

9    A.  I do not.

10            THE COURT:  Thank you.  You're excused.

11            Next witness.

12            MR. HANSMEIER:  Your Honor, I would like to call

13    Alan Cooper.

14            THE COURT:  Mr. Cooper, do you want to come

15    forward and get sworn in, please, sir.

16            Mr. Godfread, if you want to move up to counsel

17    table while your client is testifying.

18            MR. GODFREAD:  Thank you, Your Honor.  Will I be

19    able to state objections, Your Honor?

20            THE COURT:  Hold on one second.  Do you want to

21    raise your right hand.

22        (Witness sworn.)

23            THE COURT:  Have a seat.  State your name and

24    spell your last name for the court reporter, please.

25            THE WITNESS:  Alan Cooper, C-o-o-p-e-r.

1              THE COURT:  Mr. Godfread, state your appearance

2      for the record.

3              MR. GODFREAD:  Thank you, Your Honor.  Paul

4      Godfread appearing on behalf of Mr. Alan Cooper.  My last

5      name is spelled G-o-d-f-r-e-a-d.

6              THE COURT:  Okay.  He's your client.  You may make

7      objections as appropriate and then we'll give you an

8      opportunity to examine the witness when Mr. Hansmeier is

9      done.

10             MR. GODFREAD:  Thank you, Your Honor.

11             THE COURT:  Mr. Hansmeier.

12             MR. HANSMEIER:  Thank you, Your Honor.

13                           **(Alan Cooper)**

14                        **DIRECT EXAMINATION**

15     BY MR. HANSMEIER:

16     Q.  Mr. Cooper, have you ever spoken to an attorney named

17     Erin Russell?

18     A.  Yes.

19     Q.  And how about Jason Sweet?

20     A.  Yes, I have.

21     Q.  Thank you.  Mr. Cooper, isn't it true that you've

22     accused attorneys of the crimes of forging and identity

23     theft in multiple instances?

24     A.  Say that again.

25     Q.  I'm sorry.  Could you repeat your question?

1    A.  Can you repeat yours is what I meant.

2    Q.  Absolutely.  Isn't it true that you've accused attorneys

3    of forgery and identity theft in multiple instances?

4    A.  It's not accusing when it's an actual fact.

5    Q.  Mr. Cooper, I believe this is a question that's capable

6    of being answered "yes" or "no."  Is it true that you have

7    accused attorneys of identity theft and forging in multiple

8    instances?

9            MR. GODFREAD:  Object --

10           THE WITNESS:  Of forging my signature and using my

11   identity, yes, I have.

12   BY MR. HANSMEIER:

13   Q.  Mr. Cooper, are you able to see this document?

14   A.  Yes.

15   Q.  Do you recognize it?

16   A.  I have seen so many of them in the last year, it's --

17   Q.  Fair enough, Mr. Cooper.  I'm going to read the text

18   that's highlighted in yellow, "Third Party Alan Cooper's

19   Memorandum in Support of Motion to Intervene."  Did I read

20   that correctly?

21   A.  I would have to say so.  You're the one that read it,

22   sir.

23   Q.  Can you --

24   A.  I don't know what half this stuff means.

25   Q.  I'm just asking if the text I read to you is a fair and

1    accurate reading of the text.  "Third Party Alan Cooper's

2    Memorandum in Support of Motion to Intervene," did I read

3    that correctly?

4    A.  I would have to say so.  Like I said, sir, I'm not an

5    attorney.  I don't --

6    Q.  Thank you, Mr. Cooper.  And your name is Alan Cooper?

7    A.  Yes.

8    Q.  And the text highlighted in yellow is Paul Godfread.  Do

9    you recognize the name Paul Godfread?

10   A.  Yes, I do.

11   Q.  And who is he?

12   A.  He's my attorney that's here with me.

13         MR. GODFREAD:  Your Honor, is this being offered

14   as an exhibit or --

15         MR. HANSMEIER:  To refresh the witness's

16   recollection.

17   BY MR. HANSMEIER:

18   Q.  Now, Mr. Cooper, I'm going to read the text in yellow.

19   Does it say, "Attorneys for AF Holdings Have Submitted

20   Forged or Altered Documents in Other Cases"?  Is that what

21   the text says, sir?

22   A.  Yes, that's what it says.

23   Q.  And does the text in yellow say, "When comparing the two

24   signatures below, the attempt at forgery is immediately

25   apparent"?

1    A.  That's what it says.

2    Q.  And are the two names appearing below Paul Hansmeier and

3    Peter Hansmeier?

4    A.  You mean highlighted that --

5    Q.  Is that what it says?

6    A.  Yeah, that's what they say.

7    Q.  Mr. Cooper, have you ever spoken with Peter Hansmeier?

8    A.  I honestly don't know.

9    Q.  Do you have any recollection or memory of ever speaking

10   to Peter Hansmeier?

11   A.  There's been one person that came up to the cabin that

12   was -- that was quite a few years ago.  I met him one

13   weekend.  I do not remember who that was.  There was

14   different people that came in and --

15   Q.  Have you ever asked an individual named Peter Hansmeier

16   if his signature was forged?

17   A.  Can you repeat that?

18   Q.  Have you ever asked an individual named Peter Hansmeier

19   if his signature was forged?

20           MR. GODFREAD:  Objection, relevance.

21           THE COURT:  Overruled.

22           THE WITNESS:  No, I have not.

23   BY MR. HANSMEIER:

24   Q.  Did you ever ask me if my signature was forged?

25   A.  I think this is the first time I've met you today.

1   Q.  And did you ever ask any of the attorneys who filed the

2   declarations in -- the accusation in question whether any

3   signatures were forged?

4           MR. GODFREAD:  Objection, relevance.

5           THE COURT:  Overruled.

6           THE WITNESS:  Can you --

7   BY MR. HANSMEIER:

8   Q.  "Yes" or "no," Mr. Cooper.  Do you need me to repeat the

9   question?

10  A.  Can you repeat that, please?

11  Q.  Sure.  Did you ever ask any of the attorneys who filed

12  the documents in question that you've accused of forgery,

13  did you ever ask any of them if they were submitting forged

14  documents?

15  A.  I guess I don't really understand the question.

16  Q.  Mr. Cooper, I'm going to read the text to you from this

17  document.  The text reads, "My name is Peter Hansmeier.  I

18  understand that Alan Cooper has accused attorneys of forging

19  my signature on a document that was filed in a case

20  captioned Hard Drive Productions, Inc. v. Does 1 through

21  14."

22          THE COURT:  Slow down.  She's writing down

23  everything you say.

24          MR. HANSMEIER:  I'm sorry.

25          THE COURT:  Go ahead.

1    BY MR. HANSMEIER:

2    Q.  "This accusation is reckless and false.  Neither Alan

3    Cooper nor his attorney Paul Godfread ever asked me if my

4    signature was genuine.  My signature appearing in that case

5    is genuine.  I am not aware of any instance of my signature

6    being forged."

7              MR. GODFREAD:  Objection, relevance.  And as to

8    the document, hearsay.

9              THE COURT:  Overruled.  What are you -- is the

10   document you are reading from a document that's been

11   admitted in evidence or is in the file somewhere?

12             MR. HANSMEIER:  It is not.

13             THE COURT:  Okay.  Do you want to make it part of

14   the record?  Let me just caution you, Mr. Hansmeier.  You

15   show stuff on this screen.  When you take it away it's gone.

16             MR. HANSMEIER:  Okay.

17             THE COURT:  There is no -- the record will be the

18   witness looked at a document on a screen.  Mr. Hansmeier

19   read something.  But unless the document is in the record,

20   nobody can review it.

21             So I don't know if you want this document in the

22   record or not, but just to make sure you understand how

23   things work here, if it's not marked as an exhibit, if I

24   don't admit it as an exhibit, Judge Ericksen, the Eighth

25   Circuit Court of Appeals, the United States Supreme Court

1    won't have a clue what went on in this courtroom.

2            MR. HANSMEIER:  I understand, Your Honor.

3            MR. GODFREAD:  Your Honor, I would like to state

4    an objection to admitting such a document.  Any

5    affidavits --

6            THE COURT:  Nothing has been offered yet.  We'll

7    take it as they --

8            MR. GODFREAD:  Thank you, Your Honor.

9            THE COURT:  -- happen.

10           Mr. Hansmeier, you're up.

11   BY MR. HANSMEIER:

12   Q.  Well, Mr. Cooper, referring back to this document, is

13   Peter Hansmeier the person who signed the document?

14   A.  I have no idea who signed that document.

15   Q.  Is he identified as the person who signed the document?

16   Is this his name, as I'm pointing to it, right here on the

17   signature line?

18   A.  I can read Peter --

19           MR. GODFREAD:  Objection to the capacity to

20   testify.  He's already stated --

21           THE COURT:  Sustained.  Mr. Hansmeier, unless you

22   want to make some record of what document you're talking

23   about, what you will have established is that you put a

24   paper on the screen that had the name Peter Hansmeier on it.

25           MR. HANSMEIER:  Your Honor, the point I'm trying

1    to make is that Mr. Cooper has gone around the country

2    making allegations of forgery and identity theft without any

3    basis whatsoever and I'm asking him what his basis is for

4    making this allegation that someone forged Peter Hansmeier,

5    my brother's signature.  I just want to know what he knows.

6              THE COURT:  Well, then ask that question.

7    BY MR. HANSMEIER:

8    Q.  Mr. Cooper, on what basis do you rest your allegation

9    that my brother's signature is forged?

10   A.  I don't know him.  I don't know that signature.  When

11   you put it up there, I read the name.  That's what I see, is

12   Peter Hansmeier.  That's what it says.

13   Q.  Do you have any evidence to support your allegation

14   accusing other attorneys of forging Peter Hansmeier's

15   signature?

16   A.  I'm worried about my signature, making sure that my name

17   is clear.

18   Q.  I understand, Mr. Cooper.

19   A.  My name has been used.  I want to make sure my life is

20   cleaned up from whatever has been done here.  I want to move

21   on.  I have a daughter that I am concerned about.

22   Q.  Thank you, Mr. Cooper.  I want to know about this

23   allegation in particular.  Peter Hansmeier, you've accused

24   attorneys of forging his signature.  Well, I think -- if you

25   have any evidence, please tell me what it is.  Otherwise we

1    can move on.

2    A.  My signature has been forged.  Them documents that I had

3    seen on the screen earlier that you put up there, that is

4    not my signature.

5    Q.  Thank you, Mr. Cooper.

6    A.  I did not allow anybody to sign my name --

7    Q.  Thank you, Mr. Cooper.

8    A.  -- or give anyone permission.

9    Q.  Mr. Cooper, you have accused attorneys of forging Allan

10   Mooney's signature?

11            MR. GODFREAD:  Objection, relevance.

12            THE COURT:  Overruled.  Let me just make this

13   suggestion, Mr. Hansmeier.  Ask him if he has done that.

14   You're making statements and then asking him to support --

15   to give you the evidence to support the statement you made.

16   It hasn't been established --

17            MR. HANSMEIER:  I understand, Your Honor.

18            THE COURT:  -- that Mr. Cooper has accused anybody

19   of forging somebody else's name.  If you think he's got

20   that, ask him that question.  Make the foundation.  Then ask

21   him what his evidence is.

22   BY MR. HANSMEIER:

23   Q.  Mr. Cooper, have you ever accused an attorney of forging

24   Allan Mooney's signature?

25   A.  I don't know.  I don't even know who Allan Mooney is.

 1    Q.  Well, Mr. Cooper, is the text that's highlighted in

 2    yellow, does that text state, "Third Party Alan Cooper's

 3    Memorandum in Support of Motion to Intervene"?

 4    A.  That's what it says, what you read.

 5              THE COURT:  As I understand it -- put that back

 6    up, Mr. Hansmeier, please, sir.  This is a document that --

 7    slide it down.  This is document 42 in Civil No. 12-1448.

 8    It's part of the record, correct?

 9              MR. HANSMEIER:  That's correct, Your Honor.

10              THE COURT:  This is the document -- the memorandum

11    filed by Mr. Godfread in support of Mr. Cooper's motion to

12    intervene; is that correct?

13              MR. HANSMEIER:  That's correct, Your Honor.

14              THE COURT:  Okay.  That's been established.  You

15    can use this document for whatever you think it says, but to

16    keep asking him to tell you if you can read the title of it

17    doesn't help the record any.

18    BY MR. HANSMEIER:

19    Q.  On page 7 of the document does this text read,

20    "Attorneys for AF Holdings Have Submitted Forged or Altered

21    Documents In Other Cases"?

22    A.  Yes.  Once again, that's what you read.

23    Q.  And, Mr. Cooper, in your memorandum of law on page 8 of

24    the document does it read, "The names include, 'Salt Marsh,'

25    'Allan Mooney,' and 'Daniel Weber'"?

1    A.  Yes, that's what it reads on there.

2    Q.  What evidence do you have, Mr. Cooper, to support your

3    accusation that attorneys for AF Holdings forged Allan

4    Mooney's signature?

5    A.  What evidence do I -- can you repeat that, please, for

6    me?

7    Q.  Absolutely.  You've accused attorneys of the crime of

8    forging somebody's signature, specifically Allan Mooney?

9            MR. GODFREAD:  Objection, it misstates the record.

10    There is not a criminal accusation that's in the record.

11            THE COURT:  Sustained.  Just ask the witness the

12    question that was pending when he said restate the question.

13    BY MR. HANSMEIER:

14    Q.  Mr. Cooper, what evidence do you have to support the

15    proposition that Allan Mooney's signature was forged?

16    A.  I'm not worried about Allan Mooney's signature or his

17    life.

18            THE COURT:  Mr. Cooper, answer the question that's

19    asked.  Do you have evidence that Mr. Mooney's signature was

20    forged?

21            THE WITNESS:  No.  I wouldn't need to have

22    anything like that.

23            THE COURT:  You don't have any evidence of that?

24            THE WITNESS:  No.

25            THE COURT:  Okay.  Next question.

1    BY MR. HANSMEIER:

2    Q.  Mr. Cooper, have you accused attorneys of forging the

3    name of Daniel Weber?

4    A.  No.  I don't know who Daniel Weber is.

5    Q.  Mr. Cooper, I'll draw your attention to again page 8 of

6    document 42 in case 1448, 12-CV-1448, "The names include,

7    'Salt Marsh,' 'Allan Mooney,' and 'Daniel Weber.'"

8            Mr. Cooper, do you have any evidence in your

9    possession that Daniel Weber's signature was forged?

10   A.  No, I do not.

11   Q.  Let me make the question more clear.  Are you aware of

12   any evidence whatsoever that Daniel Weber's signature was

13   forged?

14   A.  No.

15   Q.  And, Mr. Cooper, have you accused attorneys for

16   AF Holdings of forging the name of Salt Marsh?

17   A.  I never even heard of Salt Marsh until last year.  So

18   this is very confusing.  I don't understand why I keep

19   getting asked things that I have absolutely no idea about.

20   Q.  Did you authorize the filing of this document?  And I'll

21   put the document up here again.  Was this document filed --

22   I'll restate the question.  Was this document filed without

23   your permission?

24   A.  No, it was not.  I've seen so many documents in the last

25   year.

1    Q.  I understand.

2          MR. GODFREAD:  Objection as to foundation.  It

3    seems to me like we're litigating the motion pending in

4    October.

5          THE COURT:  The objection is sustained.  Next

6    question.

7    BY MR. HANSMEIER:

8    Q.  Mr. Cooper, in counterclaims you filed in the U.S.

9    District Court for the Northern District of Illinois did you

10   state that the first time you can remember being associated

11   with AF Holdings was November 22, 2012?

12         MR. GODFREAD:  Objection, misstates the record.

13         THE COURT:  Overruled.  The question is did you --

14   I'm sorry.  Was it testimony or --

15         MR. HANSMEIER:  It's a pleading.

16         THE COURT:  Did you make that statement in a

17   pleading?

18         THE WITNESS:  Honestly, sir, you would have to

19   explain what the pleading is.

20         MR. HANSMEIER:  I have a copy of it.

21         MR. GODFREAD:  If this is another pleading or

22   memorandum, I will object as to foundation and relevance.

23         THE COURT:  Do you recognize this document,

24   Mr. Cooper?

25         THE WITNESS:  Like I said, I have seen so many of

```
 1    them in the last year.
 2              THE COURT:  I hear that.
 3              THE WITNESS:  They all look alike.
 4              THE COURT:  Do you recognize it or not?  If you
 5    don't recognize it, tell me you don't recognize it.  If you
 6    do recognize it, tell me that you do.
 7              THE WITNESS:  Off the top of my head, no, I do not
 8    recognize it.
 9              THE COURT:  Okay.  Next question.
10    BY MR. HANSMEIER:
11    Q.  Mr. Cooper, is it true that the first time you remember
12    being associated with AF Holdings was November 22, 2012?
13              MR. GODFREAD:  Objection, again misstates the
14    record.
15              THE COURT:  Overruled.
16              MR. GODFREAD:  Mr. Cooper has --
17    BY MR. HANSMEIER:
18    Q.  Mr. Cooper, when is the first time --
19              THE COURT:  Time-out.  Did you get an answer to
20    that question, Mr. Hansmeier?
21              MR. HANSMEIER:  I didn't, no.
22              THE WITNESS:  Can you go back to the first one,
23    the first question?
24    BY MR. HANSMEIER:
25    Q.  Mr. Cooper, is it true that the first time you can
```

 1    remember being associated with AF Holdings was November 22,

 2    2012?

 3    A.  I'm not associated with AF Holdings, for starters.

 4          THE COURT:  Mr. Cooper, the question is:  Is it

 5    true that the first time you remember being associated with

 6    AF Holdings is November of 2012?  Is that a true statement

 7    or a false statement?

 8          THE WITNESS:  I wouldn't know the exact date when

 9    the -- when it first came to my attention.

10    BY MR. HANSMEIER:

11    Q.  When did you first become aware that your name was

12    associated with AF Holdings, around what date approximately?

13    A.  Last winter 2012.

14    Q.  Would November 2012 be approximately?

15    A.  Approximately, yes.

16    Q.  So prior to that time, Mr. Cooper, did you ever hear

17    from any of your friends that you were associated with a

18    porn company?

19    A.  I was given a statement by John that if anybody ever

20    come and asked about --

21    Q.  Mr. Cooper --

22    A.  -- anything, to contact him immediately.  And I never

23    knew anything.  There was always little --

24    Q.  Mr. Cooper --

25    A.  -- bits and pieces.

1    Q.  I'll restate my question.  Prior to November 2012 did

2    any of your friends ever come to you and say, hey, you're

3    associated with a porn company?

4    A.  No.  John is the one that was associated with the porn

5    company and it was always a joke.

6    Q.  Again, Mr. Cooper, did any of your friends come and ask

7    you -- "yes" or "no."  Did any of your friends ever mention

8    to you that you were associated with a porn company?

9    A.  Prior to this 2012, no.

10   Q.  How about, did any of your co-workers ever come to you

11   and say, Alan, you're associated with a porn company or

12   otherwise give you any indication that they were aware of

13   that fact?

14   A.  No.

15   Q.  How about any other members of your community, whether

16   it was Cory Eakin [phonetic], whether it was anyone else

17   that you ever socialized, recreated with, spoke to, did

18   anyone ever give you any indication that they were aware of

19   your association with a porn company?

20   A.  There was one person that told me that I should look

21   into something very --

22   Q.  Who is that person?

23   A.  That was my -- happened to be my father-in-law at the

24   time, which was a retired sheriff.

25   Q.  But, again, Mr. Cooper, did he --

1    A.  He's the one that told me to try to figure out why John

2    is telling me to contact him if something happens.

3    Q.  I understand that conversation, Mr. Cooper, but did your

4    father-in-law say that he knew you were associated with a

5    porn company?

6    A.  No.  I gave him the business card that -- one of John's

7    business cards.

8    Q.  Were you involved in any lawsuits with respect to being

9    in a porn company prior to November 2012?

10   A.  I've never had anything to do with any porn companies or

11   lawsuits other than what this whole mess is here.

12   Q.  And how much -- well, did you lose your job because you

13   were associated with a porn company?  "Yes" or "no,"

14   Mr. Cooper.

15   A.  No.  I haven't lost my job for any reason.

16   Q.  And how much money have you paid Paul Godfread since

17   first retaining him?

18   A.  I've paid Paul nothing.

19   Q.  Has he ever sent you a bill?

20   A.  No.

21   Q.  How much money have you paid Erin Russell?

22   A.  Nothing.

23   Q.  And how much money have you paid Jason Sweet?

24   A.  Nothing again.

25   Q.  Have either of those individuals ever sent you a bill?

1    A.  No, they have not.

2    Q.  Why do you believe you are being held out as the CEO of

3    AF Holdings?

4    A.  To my knowledge, I am not the CEO of anything.

5    Q.  I understand that your position is that you believe

6    you're not the CEO of AF Holdings.  I'm asking you what is

7    it, what document did you review that made you believe that

8    there was a CEO of AF Holdings named Alan Cooper?

9    A.  I believe it was one of them first documents that you

10   had up there.

11          THE COURT:  Just for the record, Mr. Hansmeier, I

12   am handing you back what I have marked as Exhibits 1 and 2,

13   which are the documents that I believe we've established are

14   the ones you used earlier on the witness -- on the overhead

15   projector.

16   BY MR. HANSMEIER:

17   Q.  Mr. Cooper, I have now what's marked as Exhibit 1.  What

18   part of this document makes you think or identifies Alan

19   Cooper, any Alan Cooper --

20   A.  It's the next one, the other one that you have.

21   Q.  The next page or the next document?

22   A.  It's the signature part.

23   Q.  Okay.  We're looking at the third page of Exhibit 1.

24   Mr. Cooper, where is an Alan Cooper identified as a CEO?

25   A.  There's an Alan Cooper there and there was -- I was sent

1    a picture of my signature and --

2    Q.  Again, Mr. Cooper, let's focus on this for right now.

3    A.  That's what I'm doing.  I'm trying to --

4    Q.  Mr. Cooper, could you please direct your attention to

5    the --

6              THE COURT:  If you have your phone out,

7    Mr. Cooper, put it away.

8              THE WITNESS:  Yeah, I did.  I just --

9              THE COURT:  Listen to the question.  Look at the

10   exhibit.  Answer the question.

11             Next question.

12             THE WITNESS:  I was made aware of that in 2012

13   by --

14   BY MR. HANSMEIER:

15   Q.  Mr. Cooper, my question is:  What part of this document

16   identifies you as a CEO?

17   A.  It says nothing about a CEO on there.  I'm --

18             THE COURT:  Next question.

19   BY MR. HANSMEIER:

20   Q.  Mr. Cooper, I'm moving to what's marked as Exhibit

21   Number 2 and again we'll turn to the signature page of that.

22   Well, first, on the first page, is there anything on the

23   first page that identifies you or any Alan Cooper as the CEO

24   of AF Holdings?

25   A.  As far as I know, I have not read that piece of paper.

1    Q.  Well, read it right now.  Do you see any Alan Cooper

2    identified as the CEO of AF Holdings?

3    A.  It's actually quite difficult to read.

4              MR. HANSMEIER:  Your Honor, may I approach the

5    witness and give him this document directly?

6              THE COURT:  The document will speak for itself,

7    Mr. Hansmeier.  As we sit here I'm admitting Exhibits 1 and

8    2 for the purpose of this hearing.  They're in evidence.  I

9    will read them.  That's established.  Next question.

10   BY MR. HANSMEIER:

11   Q.  Mr. Cooper, how much money have you received in

12   connection with your testimony regarding AF Holdings?

13   A.  I haven't been paid anything.

14   Q.  Mr. Cooper, were you paid to travel to Los Angeles?

15   A.  No, I was not paid.

16   Q.  Who paid for your plane fare, Mr. Cooper?

17   A.  I believe it is a company or something called EFF or

18   ECC.

19   Q.  So EFF paid for your plane fare to Los Angeles?

20   A.  Correct.

21   Q.  What other expenses did EFF pick up on your behalf in

22   connection with that trip to Los Angeles for the March 11,

23   2013 hearing before Judge Wright?

24   A.  They paid for the motel.

25   Q.  And how long were you in Los Angeles?

1    A.  One night.  We got in I think mid afternoon and left mid

2    afternoon the next day.

3    Q.  So, Mr. Cooper, in a hearing before Judge Wright you

4    testified that you retained Paul Godfread after receiving a

5    text message; is that correct?

6    A.  That is correct.

7    Q.  What did that text message say?

8    A.  It basically stated that here's what -- here is proof

9    that your name was used, that your signature was forged.

10   Q.  Let's back up a little bit.  What was the first text

11   message you received?  Do you remember what that text

12   message said?

13   A.  Not off the top of my head completely.  It was --

14   Q.  Do you have a copy of that text message?

15   A.  Of the signature I do.

16   Q.  Do you have a copy of the first text message that you

17   received?

18   A.  In that time I've gone through -- I think I'm on my

19   second phone.  So, no, I do not have that on my phone.

20   Q.  What date did you receive your first text message

21   regarding your connection with AF Holdings?

22   A.  It would have been last winter sometime, November,

23   December.  I'm not exactly sure of the month.

24   Q.  And do you remember what number sent you the text

25   message?

1    A.  Yes, I do.

2    Q.  What number sent you the text message?

3    A.  I don't think that's necessary right now.

4    Q.  Mr. Cooper, what number sent you the text message?

5    A.  It would be more damaging to that person.

6    Q.  Mr. Cooper, what --

7           THE COURT:  The question is:  What number sent you

8    the text message?

9           THE WITNESS:  The number I do not remember off the

10   top of my head.  I would have to look at it.

11          THE COURT:  Next question.

12   BY MR. HANSMEIER:

13   Q.  Mr. Cooper, you just testified that you did remember the

14   number and now you do not remember the number?

15   A.  It's in my phone.  I don't remember it off the top of my

16   head.

17   Q.  Is the number in your phone?

18   A.  Yes, it is.

19   Q.  Mr. Cooper, could you review your phone and tell me what

20   the number is.

21          THE WITNESS:  Can I?

22          THE COURT:  (Indicating.)

23          THE WITNESS:  607-351-7828.

24   BY MR. HANSMEIER:

25   Q.  And do you know the name of the person that sent you the

1    text message?

2    A.  Yes, I do.

3    Q.  And what is his name or her name?

4    A.  Kim Eckenrode.

5    Q.  Can you spell that for me, please.

6    A.  No.  Kim.  Not the last name.

7    Q.  Could you repeat the last name?

8    A.  Eckenrode.

9    Q.  Ecken-rood or Ecken-root [phonetic]?

10   A.  "Rood," I do believe.

11   Q.  And who is Kim Eckenrode?

12   A.  That would be John's mother-in-law.

13   Q.  And what did her text message say?

14   A.  Like I said, I don't remember all of it.  It was she had

15   found this document with my signature on it and sent it to

16   me and then gave me a number to call to get it taken care of

17   and get my -- get it cleared up.

18   Q.  Do you mean Kim Ecken-rode [phonetic]?

19   A.  The proper pronunciation of the last name I'm not

20   exactly sure.  It could --

21           THE COURT:  I think we've identified the person as

22   being John Steele's mother; is that -- mother-in-law?

23           THE WITNESS:  Mother-in-law.

24           MR. HANSMEIER:  Mother-in-law, I believe.

25           THE COURT:  So --

1          MR. HANSMEIER:  I'll continue.

2     BY MR. HANSMEIER:

3     Q.  And the text message contained a picture of a document

4     with your signature on it?

5     A.  Yes.

6     Q.  And is it your testimony that the phone number that --

7     let me back up.  So did you text Ms. Eckenrode back after

8     receiving the text?

9     A.  Yes.

10    Q.  And what did you text back to Ms. Eckenrode?

11    A.  Like I said, I don't remember word for word, but

12    something to the effect of thank you, I'll contact whoever.

13    Q.  How did she find Attorney Godfread; do you know?

14    A.  She didn't.

15    Q.  Did she send you a phone number --

16    A.  Yes.

17    Q.  -- in the text?

18          And was the phone number Mr. Godfread's?

19    A.  No, it was not.

20    Q.  What phone number did she send you --

21    A.  It was --

22    Q.  -- or for what attorney?

23    A.  I would actually have to ask Paul what that attorney's

24    name was.  I do not remember.  And then he's the one that

25    actually referred Paul.

1      THE COURT:  Let me make sure I'm clear.  So the

2    text that you received from John Steele's mother-in-law

3    attached a document that purported to have your signature on

4    it and she included in the text the telephone number for a

5    lawyer; is that a correct statement?

6      THE WITNESS:  Yes, sir.

7      THE COURT:  Next question.

8    BY MR. HANSMEIER:

9    Q.  Mr. Cooper, on March 11, 2013 you testified that the

10   text message -- and maybe this will refresh your

11   recollection, but you were given a number to call an

12   attorney to make sure that this didn't come back towards

13   you?

14   A.  Yes.

15   Q.  What were you concerned about?

16   A.  About my name being illegally used.

17   Q.  And then you called an attorney, whatever attorney that

18   happened to be?

19   A.  Yes.

20   Q.  And that attorney referred you to Mr. Godfread?

21   A.  Yes.

22   Q.  Now, Mr. Cooper, you previously testified that you

23   learned your name was being signed, forged, and used for

24   scams; is that correct?

25   A.  Yes, that's correct.

1    Q.  Who did you hear that from?

2    A.  From Kim Eckenrode when I got the text from her and the

3    document that she sent me.

4    Q.  Has anyone else told you that your name is being signed,

5    forged, and used for scams?

6    A.  It seems as if I hear it all over the place as of

7    lately.

8    Q.  And, Mr. Cooper, you filed several documents with courts

9    around the country stating that you are an officer or at

10   times the CEO or some executive agent of AF Holdings.  Who

11   told you that you were the CEO or --

12   A.  I never filed anything saying that I was an agent or the

13   CEO on AF Holdings' behalf.

14   Q.  Well, Mr. Cooper, to refresh your recollection, your

15   attorney filed a document before this Court stating that you

16   were concerned that your name was being held out as the CEO

17   of AF Holdings.  Does that refresh your recollection?

18   A.  That sounds better, yes.

19   Q.  Who informed you that your name was being held out as

20   the CEO of AF Holdings?

21   A.  Kim was the first person that I found out anything from

22   and then I just handed it over to the attorneys and let

23   them --

24   Q.  I am specifically interested in who told you that you

25   were -- not just that your name was associated with the

1    company, but they told you that you were being held out as

2    the CEO.

3    A.  I honestly don't know.  I don't remember.  Like I have

4    said before, there's been so many things that have gone on

5    here in this.

6    Q.  Mr. Cooper, did your attorney ever tell you that when

7    these allegations first arose and that he first expressed

8    his concerns to I believe it was Mr. Steele, that Mr. Steele

9    offered to sign a document confirming that you weren't the

10   CEO of AF Holdings and offered to indemnify you against any

11   concerns that you had?

12            MR. GODFREAD:  Objection, hearsay.

13            THE COURT:  I'm sorry.  The question was did

14   Mr. Steele tell this witness what you just said?

15            MR. HANSMEIER:  My question was whether

16   Mr. Godfread had ever informed him that Mr. Steele had

17   offered to sign a document confirming he wasn't the CEO and

18   offered to indemnify him against any concerns that he had.

19            THE COURT:  And your objection is?

20            MR. GODFREAD:  Hearsay as to what Mr. Steele

21   supposedly told me.

22            THE COURT:  Sustained.  Next question.

23   BY MR. HANSMEIER:

24   Q.  Now, Mr. Cooper, you previously mentioned your

25   discussion with your father-in-law about concerns that you

1    had?

2    A.  Yes.

3    Q.  What date -- and just to refresh your recollection, you

4    also testified about this in front of Judge Wright at the

5    March 11, 2013 hearing where Judge Wright -- your testimony

6    was -- when Judge Wright was asking about the conversation

7    you had with John, anything that seemed out of place, you

8    responded, I took that to mean -- the very next day I went

9    and talked to my father-in-law, which is a retired sheriff,

10   and talked to him and he said until anybody contacts you, he

11   goes, we have nothing to go to the court system with.  Do

12   you remember that conversation?

13   A.  Yes, I do.

14   Q.  On what approximate date did that conversation take

15   place?

16   A.  It would have been several years ago.  I don't remember

17   exactly what date.  It was a few years ago and nothing came

18   of it until --

19   Q.  Mr. Cooper, can you do better than a few years ago in

20   terms of getting a more specific date?

21   A.  About 2008, 2009.

22   Q.  And that's the best you can remember about that

23   conversation?

24   A.  (Nodding.)

25   Q.  Mr. Cooper, when is the first time John Steele ever --

1          THE COURT:  I'm sorry.  I didn't get an answer to

2     that.  Is that the best you can remember about that

3     conversation?  "Yes" or "no."

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Next question.

6     BY MR. HANSMEIER:

7     Q.  Mr. Cooper, I think that's the only question I have on

8     that.

9          So, Mr. Cooper, I want to walk you through the

10    date in question which Mr. Steele discussed, March 18, 2011.

11    I want to find out what you can remember about that day, if

12    anything.  For example, do you remember what time you got up

13    that morning?

14    A.  I don't remember that day.  I don't know if he was

15    there.  I don't know if I was there.  That does not ring a

16    bell.

17    Q.  Do you remember any conversations you had that day?

18    A.  No, I do not, sir.  That's --

19    Q.  Can you tell me anything about that day in question?

20    A.  Anything that I can tell you is from what John had

21    stated is, no, I did not talk to anybody on a phone or his

22    phone, this Mark Lutz.

23    Q.  Mr. Cooper, I understand that's your position, but I'm

24    asking if you can remember anything about that day.  I mean,

25    do you remember if John was up that day?

1    A.  No, I don't remember.  I stated that.  If he was, I

2    don't remember that.  That is a very specific day.  No, sir,

3    I do not remember that day.

4    Q.  So your answer to the question of whether you remember

5    anything about the day is no?

6    A.  No.

7         THE COURT:  Actually your answer is yes, you don't

8    remember anything about the day; is that correct?

9         THE WITNESS:  It seems like it just turns every

10   different direction.

11        THE COURT:  Do you remember anything about the day

12   March 18, 2011?

13        THE WITNESS:  No, sir, I do not.

14        THE COURT:  Next question.

15   BY MR. HANSMEIER:

16   Q.  Mr. Cooper, is it true that you have been diagnosed with

17   a mental illness?

18   A.  No, that is not true.

19   Q.  Have you been diagnosed with any medical condition

20   involving your mind?

21   A.  No, sir, other than sleeping disorder.

22   Q.  Mr. Cooper, have you ever been medicated for any form of

23   mental illness?

24        MR. GODFREAD:  Objection, relevance, asked and

25   answered as well.

 1              THE COURT:  Overruled.

 2              THE WITNESS:  No, I have not.

 3     BY MR. HANSMEIER:

 4     Q.  Mr. Cooper, what drugs have you taken or been

 5     prescribed?

 6              MR. GODFREAD:  Objection, relevance.

 7              THE COURT:  Sustained.

 8     BY MR. HANSMEIER:

 9     Q.  Mr. Cooper, do you remember sending text messages to

10     Brent Berry?

11     A.  Yes, I do.

12     Q.  Do you remember asking him to go to the doctor with you?

13     A.  Yeah.  That was a joke.  I remember the text because it

14     was a conversation that me and John had.

15     Q.  Well, Mr. Cooper, let me read what your text was and you

16     can tell me where the humor is in it.

17              MR. GODFREAD:  Objection, hearsay.

18              THE COURT:  Overruled.

19              MR. HANSMEIER:  And I apologize this includes some

20     rather graphic language.

21     BY MR. HANSMEIER:

22     Q.  (As read) "Brent, I am sorry for being fucked up in the

23     head.  For some reason I am half crazy.  If I could ask one

24     favor of you.  It would mean a lot to me and Shi.  I would

25     like you to go with me to see my doctor so he can hear what

1    you say" -- "have to say about my not sure what to call it.

2    Bet you can put words to it.  And if Stevey and anybody else

3    want to come, that would be great for me.  I am sorry for

4    the way I am.  I need to be a better person for Shi and my

5    life."

6              Where's the joke there?

7    A.  The joke --

8              THE COURT:  Time-out, Mr. Hansmeier.  First of

9    all, you've just read words.  Is that the text -- is it your

10   contention that that's a text that this witness sent to

11   someone?

12   BY MR. HANSMEIER:

13   Q.  Mr. Cooper, do you recognize this?

14   A.  Yes.  I already told you before you even showed it I

15   remember it.

16   Q.  So this is a text message that you sent?

17   A.  Yes.

18   Q.  And you sent it to Brent Berry?

19   A.  Yes.

20   Q.  Where is the humor in that text?

21             MR. GODFREAD:  Objection, relevance and not sure

22   what the foundation for --

23             MR. HANSMEIER:  I believe this goes to the

24   witness's veracity.  He said that this is a joke.

25             THE COURT:  Time-out.  Your objection is

1    overruled.

2              You've testified you recognize that text.  The

3    question is:  Is there humor in that text?

4              THE WITNESS:  In the context behind it, yes.

5              THE COURT:  Next question.

6              THE WITNESS:  There was at the time.

7              THE COURT:  Just to make sure I'm clear, it's your

8    contention that the text that Mr. Hansmeier just showed and

9    you read into the record was a text you sent to Mr. Brent

10   Berry; is that correct?

11             THE WITNESS:  That is correct, sir.

12             THE COURT:  And it's your contention that it was

13   part of a joke; is that correct?

14             THE WITNESS:  Between me and John, yes.

15             THE COURT:  Between you and John Steele?

16             THE WITNESS:  Yes.

17             THE COURT:  So a joke between you and John Steele

18   manifested itself in the context of a text message from you

19   to Brent Berry; is that right?

20             THE WITNESS:  There was a situation that happened

21   that caused that text.

22             THE COURT:  Okay.  Next question.

23             MR. HANSMEIER:  Just one moment, Your Honor.

24        (Pause.)

25   BY MR. HANSMEIER:

1    Q.  Mr. Cooper, would you describe yourself as text savvy?

2    A.  Not super.

3    Q.  Do you have a computer?

4    A.  I do.

5    Q.  Do you use it much?

6    A.  I don't use it at all.

7    Q.  Would you know how to create an Internet account?

8    A.  No.

9    Q.  Mr. Cooper, have you ever signed documents on John

10   Steele's behalf?

11   A.  No, I have not.

12   Q.  Maybe to refresh your recollection, how about vehicle

13   registrations?

14           MR. GODFREAD:  Objection, relevance.

15           THE COURT:  Overruled.

16           THE WITNESS:  I transferred a snowmobile title for

17   him.

18   BY MR. HANSMEIER:

19   Q.  And when you did that, whose name did you sign?

20   A.  My name.  I think we put that snowmobile into my name.

21   Q.  So have you ever registered a vehicle in John Steele's

22   name?

23   A.  I don't think so.

24   Q.  Is it your testimony that you don't remember or that you

25   did --

1    A.  Because I have gone and picked up tabs for him and stuff

2    too before.

3    Q.  Mr. Cooper, is it your testimony that you do not

4    remember whether you've ever signed a document on John

5    Steele's behalf?

6    A.  I remember going to the DMV with a piece of paper that

7    John had mailed to me stating to use his signature to

8    transfer the title.

9    Q.  So in that case there may have been an instance in the

10   past where you used John's signature to transfer a title?

11   A.  No.  I had a piece of paper that he had mailed me saying

12   to use this piece of paper.  No, it doesn't -- there's

13   something there, but it's not ringing a bell.

14   Q.  So as you sit here today you cannot remember whether or

15   not you've ever signed a document on John's behalf?

16   A.  No.

17   Q.  Yes, you can remember or, no, you can't remember?

18   A.  I'm going to say, no, I didn't.

19   Q.  That you did not do it or you don't remember?

20   A.  That I did not do it.

21   Q.  Has Mr. Steele ever signed a document on your behalf?

22   A.  Not that I have seen.

23   Q.  So that would include utilities, phone bills for the

24   cabin up north?

25   A.  I paid the utilities.

1    Q.  And, Mr. Cooper, why do you believe that John Steele

2    owns Prenda Law, Inc.?

3    A.  Because he told me he did.

4    Q.  When did he tell you?

5    A.  Numerous times at the cabin.

6    Q.  Was he referring to Prenda Law, Inc., or was he

7    referring to Steele Hansmeier, PLC?

8    A.  Prenda.  Both.  He said --

9    Q.  Have you ever seen a document in which Mr. Steele is

10   listed as the owner of Prenda Law, Inc.?

11   A.  No, I have not.

12          MR. HANSMEIER:  That's all I have for the witness,

13   Your Honor.

14          THE COURT:  I have a few questions of Mr. Cooper.

15   Let me have back Exhibits 1 and 2.

16                          **EXAMINATION**

17   BY THE COURT:

18   Q.  Are you familiar with a company called AF Holdings, LLC,

19   Mr. Cooper?

20   A.  I know of it now, yes.

21   Q.  When did you first learn of it?

22   A.  When I got that text from Kim Eckenrode.

23   Q.  Have you ever heard of a company called AF Films, LLC?

24   A.  No, unless I seen it in some paperwork somewhere.  But

25   all this paperwork, I don't read very much of it.

1    Q.  And what you know about AF Holdings, LLC, came from

2    facts you learned after getting this text from Kim?

3    A.  Yes.

4    Q.  Did you ever hold any position with either AF Holdings,

5    LLC, or AF Films, LLC?

6    A.  No, sir.

7    Q.  Did you ever sign any documents on behalf of

8    AF Holdings, LLC?

9    A.  No.

10   Q.  Did you ever sign any documents on behalf of AF Films,

11   LLC?

12   A.  No.

13   Q.  I'm going to show you what's been admitted as the

14   Court's Exhibit Number 1.  I'm going to ask you to look at

15   page 3 of that document.  Do you see a line that says, "Alan

16   Cooper"?

17   A.  Yes, sir.

18   Q.  Is that your signature above the line?

19   A.  No, it is not.

20   Q.  Do you know who signed it?

21   A.  No, I do not.

22   Q.  Did you authorize anyone to sign your name to Exhibit 1?

23   A.  No, I did not.

24   Q.  Did you know that Exhibit 1 was being submitted to a

25   court in connection with a lawsuit against John Doe bearing

1    what purports to be your signature?

2    A.  No, I did not.

3    Q.  I'm going to show you what's been admitted as Exhibit 2.

4    Have you ever seen that document before?

5    A.  Prior to all this coming out, no.

6    Q.  Do you see a line -- a signature line on the second page

7    of that document that says, "Alan Cooper"?

8    A.  Yes, I do.

9    Q.  Did you sign that?

10   A.  No, I did not.

11   Q.  Did you authorize anyone else to sign your name to

12   Exhibit 2?

13   A.  No, I did not.

14   Q.  Did you know that Exhibit 2 was being submitted to the

15   court in connection with a lawsuit against John Doe bearing

16   what purports to be your signature?

17   A.  No, I did not.

18           THE COURT:  Mr. Godfread, did you want to ask your

19   client any questions?

20           MR. GODFREAD:  Just briefly a few, Your Honor, to

21   clarify.

22                      **CROSS EXAMINATION**

23   BY MR. GODFREAD:

24   Q.  Mr. Cooper, you heard Mr. Steele testify just earlier

25   today that he approached you in 2010 to become involved in

1    the porn industry in general?

2    A.  Yes, I did.

3    Q.  Did you take any action to become involved in the porn

4    industry in 2010?

5    A.  No, I did not.

6    Q.  Or any time since then?

7    A.  No, I have not.

8    Q.  Are you familiar with the name of the company VPR, Inc.?

9    A.  I have heard of it.

10    Q.  When, about, would you have heard of it?

11    A.  Within the last year.

12    Q.  Not in 2010?

13    A.  No.

14    Q.  Did you ever sign any documents on behalf of VPR, Inc.?

15    A.  No, I did not.

16    Q.  Did you ever agree to become an officer of VPR, Inc.?

17    A.  No, I did not.

18    Q.  Did you agree to have any position with VPR, Inc.?

19    A.  No, I did not.

20    Q.  And I apologize if I already asked this, but I want to

21    be clear.  Did you authorize anyone else to sign your name

22    on any document for VPR, Inc.?

23    A.  No, I have not.

24    Q.  Have you ever met Mark Lutz?

25    A.  No, I have not.

1    Q.  Have you ever spoken on the phone with Mark Lutz?

2    A.  No, I have not.

3    Q.  Have you ever indirectly told someone to talk to Mark

4    Lutz on your behalf?

5    A.  No, I did not.

6    Q.  I believe Magistrate Judge Noel asked you about the two

7    documents that are already exhibits.  Are there any other

8    documents having anything to do with AF Holdings or AF Films

9    that you know your name appears on?  I'll rephrase.  Have

10   you authorized your name to appear on any other documents

11   relating to AF Holdings?

12   A.  No, I have not.

13   Q.  Have you authorized your name to appear on any other

14   documents relating to AF Films?

15   A.  No, I did not.

16   Q.  You testified that Kim Eckenrode sent you a text message

17   in November 2012; is that correct?

18   A.  That is correct.

19        MR. GODFREAD:  Your Honor, I have an exhibit that

20   I would like to offer upon identification by Mr. Cooper.

21   Would that be allowed as to my appearance in --

22        THE COURT:  What is it?

23        MR. GODFREAD:  It is the printout of the text

24   message in question that Ms. Eckenrode sent to Mr. Cooper.

25   I have multiple copies.  They are numbered, but not -- page

1    numbered, but not marked as an exhibit or anything yet.

2         THE COURT:  Let's call it Exhibit 3.

3         MR. GODFREAD:  I will offer a copy to opposing

4    counsel.

5    BY MR. GODFREAD:

6    Q.  Mr. Cooper, is that the picture or accurate

7    representation of the picture that you received on your

8    phone from Ms. Eckenrode?

9    A.  Yes, that is.

10   Q.  Is that your signature?

11   A.  No, it is not.

12   Q.  The text that appears here is obviously not your phone.

13   Would you please read the text and state whether that is the

14   content of the text message.

15   A.  "Prenda is John's law firm.  John set up a bogus company

16   in St. Kitts, AF Holdings.  The company owns a copyright to

17   a porn movie.  You are the assignee.  John used your name to

18   keep his out of it cuz when someone downloads that porn

19   movie Prenda sues them on behalf of AF Holdings.  It's a

20   scam.  He sues and gets money for himself."

21        MR. HANSMEIER:  Your Honor, I am going to object

22   to the introduction of this.  Essentially it's some words on

23   paper without any context or any foundation.

24   BY MR. GODFREAD:

25   Q.  Mr. Cooper --

1          THE COURT:  Mr. Godfread, can you lay better

2    foundation as to what this is?

3          MR. GODFREAD:  Of course, Your Honor.

4    BY MR. GODFREAD:

5    Q.  Mr. Cooper, did you receive a text message with this

6    text, this same language?

7    A.  Yes.

8    Q.  Did you send this text message to anyone else?

9    A.  Yes, I did.

10   Q.  Who in particular would you have sent this text message?

11   A.  I sent that to you.  I forwarded it to you.

12   Q.  And while this is obviously not your phone --

13   A.  No.

14   Q.  -- is it your testimony that this is exactly what you

15   received on your phone?

16   A.  Yes, it is.

17          MR. GODFREAD:  Your Honor, I would like to offer

18   this as Exhibit 3.

19          MR. HANSMEIER:  Same objection.

20          THE COURT:  How is the words that we have on

21   Exhibit 3 put on Exhibit 3?  In other words, how did it get

22   from a text on the phone to the words on Exhibit 3?

23          MR. GODFREAD:  Your Honor, I simply e-mailed it

24   and printed it out, the text only.

25          THE COURT:  This is a printout made by you of an

1    e-mail to which you attached this text?

2            MR. GODFREAD:  Your Honor, after Mr. Cooper had

3    forwarded the text to me, I sent that to my computer,

4    printed verbatim, copy/paste the text message.  I'm not

5    offering it to say this is the text message itself, but that

6    these are the words, it's an accurate representation of

7    words he received that notified you of your name being used.

8            THE COURT:  Okay.  Mr. Hansmeier, anything else --

9    argument you want to make regarding the admissibility of

10   this text as described by counsel and the witness?

11           MR. HANSMEIER:  Yes.  I do not believe there's

12   sufficient foundation laid for its admission.

13           THE COURT:  That's it?

14           MR. HANSMEIER:  Yes, that's my objection and --

15   oh, and hearsay.  Those are my two objections.

16           THE COURT:  Okay.  Exhibit 3 will be received.  I

17   don't know exactly what it proves, but it will be received

18   with all the caveats that have just been described by the

19   witness and counsel as to what it purports to be.

20           Next question.

21   BY MR. GODFREAD:

22   Q.  Mr. Cooper, just maybe one last question.  Is there any

23   other reason you would have that hasn't been said already

24   that you would have to believe your name was authorized to

25   be used on any AF Holdings document?

```
 1    A.  Other than what's already been said, no.

 2            MR. GODFREAD:  Thank you.  Nothing further, Your

 3    Honor.

 4                          EXAMINATION

 5    BY THE COURT:

 6    Q.  Have you ever been employed by AF Holdings?

 7    A.  No, sir.

 8    Q.  Have you received any money from AF Holdings?

 9    A.  No, sir.

10    Q.  Have you received any money --

11            THE COURT:  What was the other company you

12    described, Mr. Godfread?

13            MR. GODFREAD:  Your Honor, Mr. Steele I believe

14    testified to VPR, Inc.

15            THE COURT:  VPR.

16    BY THE COURT:

17    Q.  Have you received any money from VPR, Inc.?

18    A.  No, I have not.

19            THE COURT:  Okay.  Any other questions,

20    Mr. Hansmeier, for the witness?

21            MR. HANSMEIER:  Yeah, very quickly.

22                      REDIRECT EXAMINATION

23    BY MR. HANSMEIER:

24    Q.  Mr. Cooper, you've testified that you never met me or

25    you've never spoken with me; is that correct?
```

```
1    A.  I believe, yes.

2    Q.  So you don't remember me going up to John's cabin, say,

3    2007, 2008 to go snowmobiling?

4    A.  So that was you, not Peter.  I had the two people

5    confused, Peter and Paul.

6    Q.  So your memory now is being a little bit refreshed?

7    A.  I knew it was one of the two.  I didn't stay around the

8    cabin, if you remember correctly, if that was you there,

9    because --

10   Q.  No, you were definitely around the cabin that whole day.

11   A.  No, sir.

12            MR. GODFREAD:  Your Honor, objection as to --

13            MR. HANSMEIER:  I won't have the colloquy.

14   BY MR. HANSMEIER:

15   Q.  Mr. Cooper, do you remember what we talked about when I

16   was up there?

17   A.  We didn't talk very much.  There's two separate cabins

18   there.

19   Q.  And, Mr. Cooper, do you remember I stayed in your cabin?

20   A.  Do you remember that I was gone all day because I didn't

21   want to have to deal with you or John?

22   Q.  I didn't realize that, you didn't want to have to deal

23   with me.

24            MR. HANSMEIER:  Anyways, that's all I have, Your

25   Honor.
```

1          THE COURT:  Thank you.  You're excused.

2          Next witness or are you done?

3          MR. HANSMEIER:  I would like to call Paul Godfread

4     for a very brief question.

5          MR. GODFREAD:  Your Honor, I am going to object.

6     I have no firsthand knowledge of it and I am going to object

7     as I'm counsel for Mr. Cooper.  I don't intend to be made a

8     witness.

9          THE COURT:  Let's take a brief recess and when I

10    come back I'll figure out whether you are going to testify

11    or not.

12         MR. GODFREAD:  Thank you, Your Honor.

13         THE COURT:  Is that the last witness, then,

14    though, if we do --

15         MR. HANSMEIER:  Yes, that will be the last

16    witness.  It will be very short.

17         THE COURT:  Let's take ten minutes.  Let's come

18    back at 11:35.

19       (Recess taken at 11:27 a.m..)

20                      *    *    *    *    *

21       (11:39 a.m.)

22                      **IN OPEN COURT**

23         THE COURT:  Mr. Hansmeier, what is it you want to

24    ask Mr. Godfread?

25         MR. HANSMEIER:  These would be questions that

 1     relate --

 2                    THE COURT:  (Indicating.)

 3                    MR. HANSMEIER:  I'm sorry, Your Honor.  These

 4     would be very narrow questions related to prior to his

 5     linking up with Mr. Cooper that go to the issue of whether

 6     or not AF Holdings was on any notice of any sort of concerns

 7     of Mr. Cooper's prior to the -- or at the time the cases

 8     were filed.

 9                    THE COURT:  Okay.  Mr. Godfread, your position is?

10                    MR. GODFREAD:  I'm not sure I understand

11     Mr. Hansmeier's position.

12                    THE COURT:  Why don't you come to the podium.

13                    MR. GODFREAD:  Thank you, Your Honor.  I guess I'm

14     not sure what I would know about whatever Mr. Hansmeier is

15     asking.  AF Holdings' notice prior to filing these five

16     lawsuits, which I believe was in --

17                    MR. HANSMEIER:  July.

18                    MR. GODFREAD:  -- July of 2012, I'm not sure what

19     knowledge I would have as to what they knew in July of 2012.

20                    THE COURT:  All right.  Have either of you thought

21     about, read, or familiar with the Shelton vs. American

22     Motors case?  You are looking at me blankly like you don't

23     know what I'm talking about.

24                    MR. GODFREAD:  I'll just say no.

25                    THE COURT:  Here's what we're going to do.  We're

1    going to break for lunch.  We will come back at 1:00 and in

2    the meantime read the case Shelton vs. American Motors

3    Corporation, 805 F.2d 1323.  It's an Eighth Circuit case

4    from 1986 that addresses the question of when it is

5    appropriate to depose opposing counsel.  It's not precisely

6    on all fours, but I think it's close enough that it gives me

7    guidance as to how to decide this.

8          But without having read it, I'm having a

9    conversation with myself.  So read the case and then when we

10   come back I'll decide what to do after hearing from both

11   sides as to how this case impacts what is being proposed

12   regarding the testimony of Mr. Godfread.

13         Is there any other testimony you have, then,

14   Mr. Hansmeier, at all?  I want to make sure that we cover

15   everything before we do that.

16         MR. HANSMEIER:  Your Honor, I would just like to

17   call John Steele to briefly address the text message that

18   was introduced as Exhibit 3.

19         MR. GODFREAD:  Your Honor, we would object as to

20   hearsay, assuming Mr. Steele was not privy to that text --

21         THE COURT:  Well --

22         MR. GODFREAD:  -- be able to testify what was

23   said.

24         MR. HANSMEIER:  More particularly the allegations

25   or the factual statements of the person stating the facts,

1        what her personal knowledge was, he does have personal

2        knowledge of.

3                    THE COURT:  Do we have Exhibit 3?

4                    MR. GODFREAD:  Your Honor, I believe I kept it.

5        And, Your Honor, this is being offered just to say what

6        Mr. Cooper was informed of that's led him to investigate

7        further and ultimately hire me.

8                    THE COURT:  All right.  Before we do that, I will

9        let you call Mr. Steele.  Let me make sure that I've got a

10       record regarding Exhibits 1 and 2.  So Exhibit 1 -- you can

11       have a seat, Mr. Godfread.

12                   Mr. Hansmeier, it's my understanding -- and

13       correct me if I'm wrong -- Exhibit 1, which is the Copyright

14       Assignment Agreement for the work known as "Sexual

15       Obsession," was attached as an Exhibit B to the complaint

16       filed in this court in Case Nos. 12-1445 and 12-1448.  Is

17       that a correct statement?

18                   MR. HANSMEIER:  That's correct, Your Honor.

19                   THE COURT:  And Exhibit 2 -- and it was the same

20       assignment on both of those, the same Exhibit B was attached

21       to both of those complaints?

22                   MR. HANSMEIER:  That's correct.

23                   THE COURT:  And Exhibit 2 is the assignment for --

24       a Copyright Assignment Agreement for a work known as

25       "Popular Demand" and Exhibit 2 was attached as Exhibit B to

 1    the complaint in three cases filed before me, Civil Nos.

 2    12-1446, 12-1447, and 12-1449.  Is that a correct statement?

 3              MR. HANSMEIER:  That's correct, Your Honor.

 4              THE COURT:  And the Exhibit B in each of those

 5    three cases was the same as Exhibit 2 in this hearing?

 6              MR. HANSMEIER:  That's correct.

 7              THE COURT:  All right.  Call Mr. Steele and let's

 8    see what that takes us to time-wise.

 9              Mr. Steele, do you want to come back to the

10    witness stand.  You are still under oath.

11         (Witness previously sworn.)

12                        **(John Steele)**

13                **FURTHER DIRECT EXAMINATION**

14    BY MR. HANSMEIER:

15    Q.  Mr. Steele, I'm showing you page 2 of what's been marked

16    as Exhibit 3 and it contains information regarding whether

17    Prenda is your firm, whether you set up bogus companies in

18    St. Kitts, and it purports to be from your mother-in-law.

19              What knowledge, if any, does your mother-in-law

20    have about your law firms and clients?

21              MR. GODFREAD:  Objection, hearsay, competence to

22    testify.

23              THE COURT:  Overruled.

24              THE WITNESS:  Based on my discussions with her, I

25    can first of all say that I have never spoken to -- or no

1       one that I am aware of in either Steele Hansmeier or Prenda

2       has ever spoken to my mother-in-law.

3               But I am well aware that Ms. Eckenrode is signed

4       onto these various websites, like DieTrollDie and

5       FightCopyrightTrolls and so on.  She is actively involved in

6       getting that information.  And I have personally seen many

7       kind of blurbs like this on the different blog sites.

8               It's based on my -- obviously this is somewhat of

9       a personal nature, but based on my multiple conversations

10      with my mother-in-law, she's a very religious person.  She

11      is very upset by the idea of my law firm having had adult

12      content clients.  She was following this very closely and

13      has on multiple occasions spoken to me.

14              I'm not obviously saying what she said, but it was

15      clear that she demanded -- why are they saying this, why are

16      they saying that, what's going on here and she was very

17      concerned about, you know, all these crazy allegations.

18              This is minor compared to some of the nonsense

19      I've read on the Internet.  And I can state for a fact that

20      most of it is just completely not true just on its face

21      because I have no ownership interest, never had, in Prenda

22      Law.  I didn't set up a company, bogus or otherwise,

23      AF Holdings.

24              So this is just like random guesswork by the

25      pirates and the infringers out there on the Internet and,

1    yes, I have received inquiries from my mother-in-law angrily

2    about the various things she's read like this.

3    BY MR. HANSMEIER:

4    Q.  And very quickly, did VPR, Inc., ever make any money?

5    A.  No, not that I know of.  I mean, I don't think it did

6    anything.

7    Q.  And my final question is:  Mr. Steele, are you involved

8    in litigation with Mr. Cooper right now?

9    A.  Yes.  This whole thing started because Mr. Cooper sued

10   me and is asking for $4.6 million as compensation for what

11   he alleges I did.

12   Q.  And did you steal Mr. Cooper's identity?

13   A.  Of course not.  It's absurd that I personally had

14   anything involved with stealing someone's identity.  It's a

15   simple fact that anybody could have acknowledged this

16   document.  It would defy logic that an attorney would, when

17   he could go to anyone in the world to get something

18   acknowledged, would instead go and steal someone's signature

19   or personality or whatever I'm -- you know, the latest

20   lawsuit from Mr. Cooper is involved in.  This is simply a

21   matter of him being mad and, as he promised me, he would get

22   me back and hopefully make a couple of million dollars off

23   of it.

24           MR. HANSMEIER:  No further questions, Your Honor.

25           THE COURT:  I have a question.

1      **EXAMINATION**

2    BY THE COURT:

3    Q.  Looking at Exhibit 3 -- it's still on your screen,

4    correct?

5    A.  Yes.

6    Q.  Do you have any reason to think that the content of that

7    text was not sent by your mother-in-law to Mr. Cooper?

8    A.  I have not spoken to my mother-in-law since I just found

9    this out in the last ten minutes, so I don't know if she

10   sent it or not.

11   Q.  But the content is consistent with things you've heard

12   your mother-in-law say?

13   A.  No.  It's consistent with things I've seen on the

14   Internet.  You know, there's entire websites designed to

15   talk bad and talk about how to come get Steele Hansmeier,

16   Prenda Law, or any firm that's going after people that steal

17   copyrighted material and they just -- a lot of times they

18   just make stuff up and hope that it, you know, causes

19   problems for the attorneys.

20        Because we didn't have a problem.  When we were

21   suing people under Steele Hansmeier and they would come up

22   with their defenses and so on, none of them worked.  So now

23   they just resort to just sliming mud and saying that we're

24   scumbags and we're unethical and we're stealing and we're

25   cheating.

1          And they successfully turned the page.  Instead of

2     worrying about, well, did you or did you not steal this

3     content, they turned it around to, well, the other attorneys

4     on the other side are bad guys.

5          Well, that was a nice little slight of hand, but

6     the reality is that this is written by anonymous pirates out

7     on the Internet that are simply making stuff up that I

8     believe a 30-second review of the Illinois Secretary of

9     State website would show is complete nonsense.

10          I don't mean to ramble or rant.  It's just very

11     upsetting to sit here and --

12     Q.  What will the Secretary of State's website in Illinois

13     tell us?

14     A.  Well, because someone I know named Paul Duffy created

15     Prenda Law, created it in November of 2011.  He's on the --

16     they show, like, who created and who owns it.

17     Q.  But AF Holdings is incorporated in Illinois or somewhere

18     else?

19     A.  I believe it's located in Nevis.

20     Q.  And where is that in relation to St. Kitts?

21     A.  I believe they are the same country.  I believe they --

22     I'm not an expert, but I believe it's called Nevis and

23     St. Kitts.  It's a country where many of our clients --

24     Q.  So --

25     A.  Many of our clients have incorporated their adult

1    content companies in that country.  That's a pretty common

2    practice.

3    Q.  Not in Illinois?

4    A.  I did have -- let's see.  I do know of a company or two

5    that has incorporated in Illinois, but nothing that I have

6    ever worked with or whatever.

7              THE COURT:  Anything else, Mr. Hansmeier?

8              MR. HANSMEIER:  Nothing further, Your Honor.

9              THE COURT:  Thank you.

10             THE WITNESS:  Thank you.

11             THE COURT:  Let's take a recess for lunch.  We'll

12   come back at let's call it 1:15 now.  Eating into our

13   lunchtime.  We'll be back at 1:15.  Be sure to read the

14   Shelton vs. American Motors case and I will decide whether

15   Mr. Godfread has to testify or not.  We're in recess.

16        (Recess taken at 11:52 a.m.)

17                    *    *    *    *    *

18        (1:19 p.m.)

19                          **IN OPEN COURT**

20             THE COURT:  Mr. Hansmeier, have you had a chance

21   to read Shelton vs. American Motors?

22             MR. HANSMEIER:  I have had a chance to read it,

23   Your Honor.

24             THE COURT:  Come tell me what impact, if any, you

25   think it has on your request to call Mr. Godfread as a

1     witness.

2              MR. HANSMEIER:  I think for the purpose of the

3     request for which I was going to call Godfread, I would

4     retract my request to call him as a witness.  I don't think

5     I can support that request under that case.

6              THE COURT:  Okay.  Anything you want to add,

7     Mr. Godfread?

8              MR. GODFREAD:  No, Your Honor.  Just I also

9     believe it would not give him any grounds to call me as a

10    witness.

11             THE COURT:  Okay.  All right.  Then the last thing

12    I have for you, Mr. Hansmeier, is my order scheduling this

13    hearing -- as I understand it, you are done, then, you are

14    not going to call Mr. Godfread, you rest on the issue that I

15    asked you to present today?

16             MR. HANSMEIER:  Yes, Your Honor.

17             THE COURT:  All right.  Well, one of the things I

18    said in the order was Mr. Cooper shall appear in person,

19    which he did, and you examined him.  Then I said, "An

20    officer of the plaintiff capable of testifying as to the

21    authenticity of each document," referring to Exhibit B to

22    the complaints, "shall appear in person at the evidentiary

23    hearing."

24             Correct me if I'm wrong, but we have not heard

25    from anyone from AF Holdings.  Is that correct?

 1            MR. HANSMEIER:  That's correct, Your Honor.  I

 2      did --

 3            THE COURT:  Just to make sure I'm clear, we've

 4      heard from Mr. Steele, who I'm not sure what his

 5      relationship to all of this is other than he testified he

 6      was a former law partner of I'm assuming you?

 7            MR. HANSMEIER:  Yes, that's correct, Your Honor.

 8            THE COURT:  And we've heard from Mr. Berry, who is

 9      a real estate agent up in northern Minnesota?

10            MR. HANSMEIER:  That's correct.

11            THE COURT:  And we heard from Jason Flesher, who

12      was an acquaintance of Mr. Cooper, correct?

13            MR. HANSMEIER:  Yes, a mutual friend of

14      Mr. Cooper's and Mr. Steele's.

15            THE COURT:  And we've heard from Mr. Cooper.  So

16      where's AF Holdings?

17            MR. HANSMEIER:  I certainly understand the

18      question and I know that the plaintiff filed objections to

19      the order for Mr. Lutz to appear, but that aside, Mr. Lutz

20      was informed of the hearing.  He indicated his intention to

21      attend the hearing and, in fact, I even have his boarding

22      pass that he was supposedly going to have to come here

23      today.  I don't know why Mr. Lutz isn't here.  I have not

24      been able to get in touch with him.

25            THE COURT:  Mr. Lutz, you're representing to the

1     Court, is an officer of AF Holdings?

2              MR. HANSMEIER:  The sole officer, yes.

3              THE COURT:  The sole officer.  Sole employee?

4              MR. HANSMEIER:  I'm not sure -- I mean, I am

5     getting into --

6              THE COURT:  Okay.  Never mind.  I will withdraw

7     that question.  But he's the guy who would be able to

8     testify on behalf of AF Holdings?

9              MR. HANSMEIER:  He's the guy.  And I would mention

10    that he has previously shown his willingness to attend

11    proceedings before this court.  He did make -- or he did

12    take the opportunity to attend the August 5th case

13    management conference.

14             THE COURT:  By telephone?

15             MR. HANSMEIER:  He was here in person.

16             THE COURT:  He was here in person?

17             MR. HANSMEIER:  Absolutely.

18             THE COURT:  And you expected him to be here today,

19    but he just failed to appear?

20             MR. HANSMEIER:  Yes.  And I have not been able --

21    I have tried --

22             THE COURT:  You have tried to call him?

23             MR. HANSMEIER:  -- obviously to try to reach him

24    via phone, via e-mail.  I have not been able to reach him.

25             And, in fact, he was booked on the same flight as

1    Mr. Steele from Miami, Florida, and Mr. Steele showed up at

2    Mr. Lutz's apartment the morning of the flight and went into

3    the apartment and found the apartment -- that Mr. Lutz was

4    not in his apartment in about, I want to say, 7:00 a.m. or

5    so.

6            He drove around South Beach, Miami, looking for

7    Mr. Lutz at all of Mr. Lutz's usual places to recreate and

8    he was unable to find Mr. Lutz.  And he talked with some of

9    Mr. Lutz's friends that he was able to get on the phone and

10   they said that Mr. Lutz had told everyone that he was

11   hanging out with that night that he needed to call -- make

12   it an early night because he was coming here to Minnesota to

13   testify in this case.

14           THE COURT:  Mr. Lutz lives in Miami, Florida?

15           MR. HANSMEIER:  He does.

16           THE COURT:  Okay.  Is there any other record you

17   want to make regarding your attempt to produce an officer of

18   AF Holdings to testify?

19           MR. HANSMEIER:  With leave of the Court, I would

20   like to have an opportunity to file a declaration

21   explaining -- more or less recapping the circumstances

22   presented here, along with attaching his boarding pass to

23   show that he had, in fact, purchased a ticket.

24           THE COURT:  How did you get ahold of his boarding

25   pass, just out of curiosity?

1          MR. HANSMEIER:  Mr. Steele had it.  That's why he

2     was at Mr. Lutz's apartment, he was going to pick him up to

3     go to the airport.

4          THE COURT:  Okay.

5          MR. GODFREAD:  Your Honor, if I may note --

6          THE COURT:  Hold on one second.  Anything else you

7     want to put on the record at all, then?  You rest?  You want

8     to file a declaration and then be done?

9          MR. HANSMEIER:  That's correct, Your Honor.

10         THE COURT:  Thank you.  Have a seat.

11         Mr. Godfread, something else you wanted to say?

12         MR. GODFREAD:  Yes, Your Honor.  I just briefly

13    wanted to call attention to the Court that Mr. Lutz has

14    failed to appear for other evidentiary hearings in the --

15         MR. HANSMEIER:  Objection, Your Honor.  He --

16         THE COURT:  We're just arguing here.  There's no

17    evidence being taken at the moment.

18         MR. GODFREAD:  For example, a case pending -- an

19    AF Holdings case pending in the Northern District of

20    California, AF Holdings v. Navasca, Mr. Lutz was again

21    supposed to appear to testify for AF Holdings.  He did not

22    show for a -- I believe it was an evidentiary hearing before

23    Magistrate Judge Vadas, if I am saying that correctly,

24    V-a-d-a-s, without explanation at the time.  I believe he's

25    also failed to appear for a noticed deposition in a case

1     pending in Georgia, another AF Holdings case as well.

2              Nothing else.  I just wanted to point out to the

3     Court that from my perspective I'm seeing a pattern of no

4     show when it's a matter of testifying under oath by

5     Mr. Lutz.

6              THE COURT:  All right.  Mr. Hansmeier --

7              MR. HANSMEIER:  May I have rebuttal, Your Honor?

8              THE COURT:  -- do you wish to respond to that?

9              MR. HANSMEIER:  I mean, this is a pattern of

10    conduct by Attorney Godfread, presenting arguments to the

11    court without a full and fair explanation of what's on the

12    record and what he very well knows is on the record.  This

13    is -- it's an incredible pattern of misconduct on

14    Mr. Godfread's part.

15             The explanation for the Northern District of

16    California case is that again Mr. Lutz intended to appear.

17    He had a plane ticket, but he was apparently detained by

18    agents in the airport, federal agents, who detained him for

19    ten hours before he could -- before they released him on his

20    own recognizance through no -- at least according to -- and

21    I am reading this through an affidavit.  I don't have

22    personal knowledge of the circumstances, but this is an

23    affidavit that was filed in the case where Mr. Lutz

24    explained that he was detained in the airport.  He was

25    released --

1          THE COURT:  By whom?

2          MR. HANSMEIER:  Well, the affidavit says federal

3     agents.  So it could be TSA.  It could be who knows.

4          THE COURT:  There's no identification of what

5     agency held him or for what purpose?

6          MR. HANSMEIER:  I believe Mr. Lutz was asked to

7     file the affidavit, a more fuller explanation, under seal

8     for purposes of -- you know, it's an embarrassing

9     circumstance, but it was through no fault of his own, no

10    legal proceedings or anything.

11          And Mr. Lutz has appeared before a federal court

12    and testified under oath in the District of Arizona, subject

13    to cross examination, under oath, Judge Snow.  And so

14    this --

15          THE COURT:  About what topics?  The same topics

16    that are at issue here?

17          MR. HANSMEIER:  The very same topics.  It was a

18    hearing that was held shortly in the wake of Judge Wright's

19    order being issued and so Judge Snow of the District of

20    Arizona issued an order to show cause regarding ownership

21    issues and the Alan Cooper issue.

22          THE COURT:  And did Mr. Lutz testify regarding the

23    authenticity of the assignment agreements at issue in this

24    case?

25          MR. HANSMEIER:  I can't say specifically what his

1    testimony was in that case.  I was not an attorney of record

2    on it and I was not at the hearing and I have not reviewed

3    the transcript of the hearing, but I am aware that the

4    order to show cause that issued had the concern of forgery

5    and the concern of the ownership structure and whether

6    there was adequate disclosure of who owns what in terms of

7    AF Holdings.

8              THE COURT:  All right.  Have I heard you out?

9              MR. HANSMEIER:  And as for the deposition thing, I

10   just don't know what the circumstances are about that.  But

11   yes.

12             THE COURT:  All right.  I will take all of this

13   under advisement.  Any declaration you want to file, get it

14   filed by close of business tomorrow, October 1st, regarding

15   Mr. Lutz.  I will take the matter under advisement and issue

16   an order in due course.  Thank you all very much for coming.

17   We are in recess.

18       (Court adjourned at 1:29 p.m.)

19                        *     *     *

20       I, Lori A. Simpson, certify that the foregoing is a

21   correct transcript from the record of proceedings in the

22   above-entitled matter.

23

24             Certified by:  *s/ Lori A. Simpson*

25                            Lori A. Simpson, RMR-CRR